VESTAL & VERNON AGENCY, et al. *v.* PITTMAN.

Jan. 11, 1954

No. 39036 48 Adv. S. 26 69 So. 2d 227

*Vardaman S. Dunn,* Jackson, for appellants.

*Satterfield, Ewing, Williams & Shell; Young & Daniel,* Jackson, for appellees.

574

Lee, J.

This cause had its origin as a claim for compensation by Mrs. Ernestine Pittman and her three children against Nelson Vestal and E. C. Vernon, doing business as Vestal & Vernon Agency, and their insurers, on account of

the death of Carl Leroy Pittman, their husband and father. An award was made by the attorney-referee, which was subsequently affirmed by the Commission and by the circuit court. The defendants in the proceeding appealed.

On November 2, 1951, about 3:30 P. M., the decedent, while driving an automobile in a southerly direction on Highway 49E, about eighteen miles south of Greenwood, Mississippi, collided with a truck, and received injuries from which he died two days later.

The question for determination was whether the decedent, at the time, was an employee of Vestal & Vernon Agency or an independent contractor; and if an employee, whether or not his injury and death arose out of and in the course of his employment; and also the amount of his average weekly wage at the time.

There is no concern here in regard to the status of insurance agents generally. The sole question is the determination of the status of the particular agent here.

Vestal & Vernon Agency were general agents for two insurance companies. They advertised for salesmen to act as sub-agents. During April, 1951, Pittman answered one of the ads in a Jackson newspaper, and was appointed. He was trained by Louis Sutherland, a salaried employee of the Agency. For the first time, the Agency set up the "crew" method of solicitation. It functioned in this manner: A county would be circularized in advance by sending information to prospective purchasers, who, in turn, would signify their interest by mailing the "tell me more" coupons to the home office of the insurance company. Such replies were then forwarded to the Agency and were called "leads." Following the circularization and the accumulation of leads, the crew of four would be sent into that county.

Pittman and the other members of the crew lived in the Jackson area. Usually they went out on their work Monday morning and returned Friday evening. They

lodged at the same hotel or tourist court, kept the Agency informed as to where they could be located, received mail and telephone calls, and occasional visits from Sutherland. They were expected to mail, within a reasonable time, preferably daily, the applications which they obtained for policies. They customarily reported to the office of the Agency on Saturday morning, when they would settle their accounts for the business of that week, talk shop, and receive their leads for the next week. Considerable expense was incurred in obtaining leads, and the members of the crew were expected to work them although they were at liberty to call on other prospects. One crewman depended on the leads for 99% of his calls. The crew members furnished their own transportation and paid for their meals and lodging. They could be fired by the Agency, or could quit voluntarily, at any time. They collected the initial premium and received their pay from a 60% commission of the quarterly, 40% of the semi-annual, and 30% of the annual, premiums.

Pittman, because of his personality, energy, enthusiasm and success as a solicitor, was appointed the crew leader. As such, he was expected to keep the other members in good spirits, "pat them on the back" and help the other agents, especially the new ones, with their applications. Crewman J. E. Weathersby testified that if anything had come up, about which he did not know, he would have asked Pittman. When crewman John E. Gribble started to work, Pittman helped him to correct errors in applications and showed him how to make out daily reports. On a number of occasions Pittman distributed the leads for the week. For his compensation as leader, he was given a 5% "over-ride" on the policies sold and delivered by the other members of the crew. This amount was not paid by the other agents from their commissions, but was paid by the Agency out of its part from the sale of insurance.

The foregoing facts are without substantial conflict.

Mrs. Ernestine Pittman testified that she went with her husband to the office of the Agency practically every Saturday morning, and that the other members of the crew were also present. They went to Sutherland's office to find out where they were to work the next week and for their instructions. Sutherland was her husband's boss, and would give the leads to her husband, who would, in turn, divide them up. Her husband was required to inform the Agency where the crew was staying, and to make daily reports. On one occasion, Sutherland "reamed out" her husband for not sending daily reports. On another occasion, her husband wanted to work in the Delta but Sutherland told him that the area was not ready. They were instructed to sell hospital insurance only at Corinth. Sutherland told her husband to give the crew members only so many leads as they could call on, and instructed him to tell them to "spit where they spit; if they talk country, talk country." Sutherland instructed her husband about his dress, to keep himself neat, and his automobile clean, and to get letters of introduction from prominent people. The agency also gave her husband a batch of delinquent renewals, and asked him to call on those people about reinstating their policies.

E. C. Vernon, one of the partners, called as an adverse witness, admitted that the Agency furnished a brief case and sales kit, but did not know whether Pittman paid for the same. Sometimes he furnished agents with money for personal needs. The crew was instructed not to sell health and accident insurance in Alcorn and Tishomingo Counties. Pittman had no authority to hire an assistant. He was expected to follow the rules of the home office. He did not say whether Pittman would have been paid the over-ride if he had laid off on his own volition. While testifying repeatedly that the agents were independent contractors, yet when in an effort to show control, counsel questioned him about Sutherland's giving

instructions, his reply was, "We like to think we advise with them rather than demand or instruct."

Other witnesses for the appellants testified in detail to establish the contention that Pittman was no different from its other agents, and that he was an independent contractor and not an employee. Running through all of this testimony, which was calculated to show that Pittman, in the performance of his service, was an independent contractor rather than an employee, was the theme that he usually did thus and so, or that it was customary to do so, or that he was expected to do this or that, or that good business would require such a course, or other like synonyms. In view of the fact that one of the partners admitted that "We like to think we advise with them rather than demand or instruct," the trier of facts was well-warranted in concluding that those expressions were in fact euphemisms for the words *instruct, command and order*; that the right of control actually existed; and that the substitution of agreeable and nonoffensive terms for harsh and unpleasant ones did not change his status.

There are many cases in our reports which have dealt with the principles for determining whether a particular person was an agent or a servant, or an independent contractor. Some of these are Kughn v. Rex Drilling Company, (Miss.), 64 So. 2d 582; Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408; Cook v. Wright, 177 Miss. 644, 171 So. 686; Texas Company v. Mills, 171 Miss. 231, 156 So. 866; McDonald v. Hall-Neely Lumber Company, 165 Miss. 143, 147 So. 315; Natchez Coca-Cola Bottling Company v. Watson, 160 Miss. 173, 133 So. 677; Kisner v. Jackson, 159 Miss. 424, 132 So. 90; Caver v. Eggerton, 157 Miss. 88, 127 So. 727. The governing principles have been fully settled. The difficulty comes in applying those principles to the facts in the varying cases.

There is great similarity in the present case with the facts in Life & Casualty Insurance Company v. Curtis, 174 Miss. 768, 165 So. 435. In that case, Pace was em-

ployed to collect premiums weekly and write new business in a certain territory. He and the other agents were required to meet with a superintendent in that area for instructions, to report their collections, and to give reasons for their failure. There was evidence that this superintendent was the "boss" of the men. The company could fire Pace, or he could quit, at any time. He owned the automobile which he was operating at the time of the injury. It was the duty of the superintendent to enforce the company's rules. On the contrary, the company's evidence to show that Pace was not its employee was voluminous. The Court held that the evidence was sufficient to warrant the jury in finding that Pace was an employee, subject to control and direction by the company, and that he was not an independent contractor.

Appellants contend that Crescent Baking Company v. Denton, 147 Miss. 639, 112 So. 21, is directly in point for them. In that case, Pinkston, the auto driver who struck and killed the child, bought bread from the bakery company in the morning and sold it to his customers along his designated route during the day. Such bread as he did not sell was his loss. He was not hired and could not be discharged. The company could refuse to sell him bread, if he failed to pay for it or deliver it to his customers. The opinion said that "The baking company did not furnish the means of transportation, nor did it have control over it, *nor did it have the right to control Pinkston in any respect in the operation of the truck in selling and delivering bread to the customers along his route.*" (Emphasis supplied.) Thus, because the baking company was interested only in the results and not in the method of obtaining such results, it was held that the relationship between it and Pinkston was not that of master and servant. The absence of the right to control was the decisive point in the case, and distinguishes it from the one now under consideration.

 Without attempting to repeat or again enumerate the various acts in their course of dealing, which have been pointed out hereinabove, it is sufficient to say that a consideration of all of the evidence other than Mrs. Pittman's, could well lead to the conclusion that the Agency had authority to control Pittman not only as to the results, but also as to the details of his work. And when to this there is added her testimony in regard to positive acts of control which were exercised by the Agency and its representative over her husband in the performance of his duties, it is clear that the trier of facts had ample evidence to justify an award to the claimants on the ground that their husband and father was an employee of the Agency and was not an independent contractor.

 Having determined that Pittman was an employee of the Agency, the next question is whether or not his death arose out of and in the course of his employment. He had breakfast with his coemployees, in accordance with his general duties and as crew leader that morning, and informed them of his mission for the Agency at Lake Cormorant and Walls. He was expecting to return to Jackson in order to be present for the meeting in the office of the Agency the next morning. At the time of the accident he had on his person applications for policies and checks in payment of premiums. He was traveling a highway over which he might properly have expected to journey from his work that day to Jackson for the meeting the next morning. There was no proof that he was not engaged in the Agency's business at the time. Consequently, the presumption is that his death arose out of and in the course of his employment. Majure v. Alsup & Associates, (Miss.), 63 So. 2d 113.

While Whittemore Brothers Corporation v. De Grandpre, 202 Miss. 190, 30 So. 2d 896, involved a construction of the Massachusetts Workmen's Compensation Act, it is in fact very informative on this question. There De Grandpre, a traveling salesman for the appellant, was

assigned to the State of Arkansas, but had headquarters at Vicksburg, Mississippi. After completing his work at McGehee, Arkansas, he set out for his headquarters. He was injured in a traffic accident a few miles East of Tallulah, Louisiana, on the route to Vicksburg. He expected to resume his work the following Monday, after attending to clerical duties over the week-end. Under such circumstances, his injuries were held to be compensable.

Pittman, at the time of his injury, was evidently on his way to Jackson so that he could report and attend the meeting the next morning—a duty to the Agency. Undoubtedly he also expected to go home—a benefit personal to him. The existence of such dual purposes does not defeat claims for compensation. On the contrary, when they arise under those circumstances, they are compensable. Mills, et al. v. Jones Estate, 213 Miss. 680, 56 So. 2d 488, and authorities there cited.

The last question involves the determination of the decedent's average weekly wage. Appellants contend that, if Pittman was an employee, he was such only because of the 5% over-ride, and hence, his average weekly wage would entitle the claimants to only $10, rather than $25, for each week.

We do not reach this question because it has been decided that the trier of facts was warranted in finding that Pittman was controlled or was subject to be controlled by the Agency in the performance of his work. The payment of the over-ride was not the sole reason for concluding that he was an employee. On the contrary, the many other enumerated elements, combined with that fact, determined his relationship as that of an employee of the Agency, and such determination completely dispels the theory of independent contractor.

For the reasons stated, it follows that this cause ought to be, and is, affirmed.

Affirmed.

*Roberds, P. J.* and *Kyle, Holmes* and *Ethridge, JJ.,* concur.

---

### ON MOTION FOR APPROVAL AND ALLOWANCE OF ATTORNEYS' FEES

LEE, J.

This is a motion by Mrs. Ernestine Pittman, for herself and her three children, the appellees, and their attorneys of record, for the approval of their contract in reference to attorneys' fees.

The attorneys represented the appellees from the inception of this claim to its final conclusion in this Court. No attorneys' fees have been allowed either by the Commission or the circuit court. The parties have agreed that the amount of such fees shall be 33 1/3% of all sums recovered and to be recovered, subject to the approval of the court.

The compensation for the attorneys, as provided in the agreement, is fair, just and reasonable, and the agreement is, therefore, approved.

The Commission is directed to make a partial lump sum settlement, sufficient to cover such fee of 33 1/3% to the attorneys, as provided by the statutes. Ada Hill v. United Timber & Lumber Company (Miss.), 68 So. 2d 420.

Motion sustained and attorneys' fees allowed.

*Roberds, P. J.,* and *Kyle, Holmes* and *Ethridge, JJ.,* concur.