WILSON FURNITURE Co., et al. *v.* WILSON, et al.

No. 41267          November 2, 1959          115 So. 2d 141

*Dent, Ward, Martin & Terry,* Vicksburg, for appellants.

*John B. Gee,* Vicksburg, for appellees.

LEE, J.

Mrs. W. A. Wilson and others, the dependents of W. A. Wilson, deceased, filed a claim for benefits under the Workmen's Compensation Act against the Wilson Furniture Company, employer, and its insurer, the United States Fidelity and Guaranty Company, on account of the death of their husband and father. Benefits were denied by the attorney-referee, and this action was affirmed by the Commission. On appeal, the circuit court reversed the order of the Commission and entered a judgment in favor of the claimants for all benefits provided by the Act. From that judgment, the Company and its insurer appealed.

W. A. Wilson, accompanied by his daughter, Charlotte Ann, and niece, Mrs. Irene Nanson, as guests, was killed instantly about 2:20 P. M., Saturday, June 15, 1957, when a Ford automobile, the property of Wilson Furniture Company, which he was driving in an easterly direction on old Highway 80 in Rankin County, collided with another automobile proceeding south on the Whitfield Road, in the intersection of the two roads. The decedent had left Vicksburg about noon that day. Protection was afforded to both Mr. and Mrs. Wilson for workmen's compensation benefits in their insurance policy.

The contention of the appellants in the previous hearing was then, and is now, that Wilson, at the time of

his death, was not engaged in any business for the company and that his death did not arise out of, and in the course of, his employment; but that he was on a private mission to deliver his niece to the Insane Hospital at Whitfield, and for that reason, they are not liable for benefits which are required to be paid under the Workmen's Compensation Act.

Wilson Furniture Company was a partnership, composed of Mr. and Mrs. W. A. Wilson as equal partners, doing a retail furniture business and the repair and manufacture of such merchandise in the City of Vicksburg, with an interest in a similar business at Hollandale, Mississippi, and with extensive farming and rental interests in the city and adjacent areas. Charge accounts aggregated about five hundred in number, and some of the debtors moved about from plact to place. Wilson spent about one-third of his time on collections and other outside matters.

Mrs. Irene Nanson was an incompetent. She had lived in the Wilson home for several years. She had become uncontrollable and the Wilsons decided that she should be placed in the state institution at Whitfield. To that end, Mrs. Wilson, early in the morning of June 15, 1957, called the Sheriff of Warren County and told him that it was necessary to take their niece to Whitfield. He advised that, if she would get the certificate of two physicians and deliver the incompetent to the institution by 5 o'clock that afternoon, the authorities would accept her; but that, if he had to handle the matter, the incompetent would have to be kept in jail until the legal requirements were complied with. Consequently Mrs. Wilson, not desiring to have her niece placed in jail, went to the hospital, and with the aid of the sheriff, secured the necessary certificates.

Mrs. Wilson testified that, when she returned from the hospital, Mr. Wilson stated that "he had some business to tend to in Jackson and also business in Crystal

Springs and he said on his way there or back he would drop her (Mrs. Nanson) off at the hospital." She also said that the trip was not primarily to carry Mrs. Nanson to Whitfield. She said that her husband told her that he had business at Crystal Springs with Dr. Messer about some columns from an ante-bellum home and Mr. Brown about some lumber. She identified an account of L. C. Pope of Morton, Mississippi, and an account of Horace and Cedella Mack, 724 Lynch Street, Jackson, Mississippi, both of which were in arrears. These claims were referred to Wilson for his attention on the trip. She did not give him the accounts, but a slip of paper to that effect was taken from the bookkeeper as they never release the records. It was customary, if there were some bad accounts in the area where Wilson was going, to attend to them; and this was true even when he was on a pleasure trip. In reply to the question as to whether she knew that her husband was going to Morton or to Edwards, she said: "Well I could not say that I know he was going. It was his intention." Again, in response to the question that her husband did not tell her that he was going to Morton, she said: "He was headed for Morton when he took the last card." Again when she was pressed to say whether her husband had told her that he was going to find Pope at Morton, she replied: "No, sir, Mr. Wilson did not make any remarks to me whatever."; but she then said that he definitely told her he was going to Crystal Springs. She admitted that she did not know, at the time her husband left Vicksburg, that he had the accounts, above referred to, and that "The only remark he made to me was he was tending to business in Jackson."

Mrs. Gadsey Ellen Wilson, the company's bookkeeper, testified that her father-in-law, Mr. Wilson, asked her to get up any accounts that he had in the general direction that he was going, and he would pick them up; that he instructed her to get the accounts in the general direc-

tion of Jackson because he was going over that way on business, and, "while he was over there he was going to take" Mrs. Nanson to Whitfield; and that she listed the accounts of L. C. Pope, Route 1, Morton, Mississippi, and Horace Mack, 724 Lynch Street, Jackson, Mississippi, in arrears of $9.69 and $32.55, respectively.

For the appellants, Dr. Otho Messer testified that he had talked to Wilson about a month before the latter's death in regard to the purchase of the columns in which he was interested. At that time, Wilson did not know whether he would sell them. It was agreed that, if he decided to do so, he would let the doctor know. To that end, the doctor left his telephone number, but he had received no communication whatever from him. If Wilson was on his way to Crystal Springs to see him that day, the doctor knew nothing about it.

Armon Brown testified that, in the past, he had sold Wilson some lumber when he was building some houses for rent; and at different times had seen him both in Vicksburg and Crystal Springs. However, their last business was in 1956, and he had transacted none whatever with him in 1957. Several people had informed him that Wilson, at different times, had indicated that he wished to see the witness, but that he had not gone by his place of business. On June 15, 1957, the day of Wilson's death, the witness left his home about 7 A. M., went to Meadville, picked up a load of furniture, and delivered it to Brandon. He passed the scene of the accident about 2:30 or 3 o'clock that afternoon, and did not return home until late that day.

■■ It is well settled that, when a motor vehicle of a defendant is being driven by one of its regular employees, the presumption arises that such driver is engaged in the line of his appointed duties and in the furtherance of his employer's business. If it is claimed that the employee at the time deviated from his duty and was on a mission purely personal to himself, the burden

is on the employer to prove that the employee has abandoned the duties of his employment, and has gone about some purpose of his own in which the employer's business is not concerned and which is not incident to his employment. If the evidence leaves this question in doubt, the issue must be submitted to the jury. Eagle Motor Lines, Inc. v. Mitchell, 223 Miss. 398, 78 So. 2d 482; Pennebaker v. Parker, 232 Miss. 725, 100 So. 2d 363.

Mrs. Wilson testified that her husband told her definitely that he was going to Crystal Springs on business. Yet the testimony of both Dr. Messer and Armon Brown showed that they were not expecting a call from Mr. Wilson. It seems altogether improbable that, if Mr. Wilson was going from Vicksburg to Crystal Springs, he would drive past the intersection of Highway 51, through the City of Jackson into Rankin County and thence to Whitfield, and thereafter follow a circuitous route to Crystal Springs when he could have gone directly to his destination over a national highway. If Crystal Springs was his intended destination, undoubtedly he deviated from his course. It is clear that it was his purpose to deliver his niece to the hospital at Whitfield, and he was undoubtedly on that mission at the time of his death. Under that view, the mission was personal, and, in no way, connected with the business of the partnership.

In Durr's Dependents v. Schlumberger Oil Well Surveying Corporation, 227 Miss. 606, 86 So. 2d 507, it was held that Durr's trip from Laurel to Brewton was his own personal mission, and, for that reason, his dependents were denied compensation. Likewise, in Dowdle & Pearson, Inc. v. Hargrove, 222 Miss. 64, 75 So. 2d 277, where Hargrove had spent his lunch time in personal visitation and driving about the northeast section of the City of Columbus when the service station for which he worked was in the western part of the city, and the cir-

cuit court reversed the Commission in its denial of compensation, and awarded benefits, this Court in turn reversed the award by the court and affirmed the action of the Commission. In Bryan Brothers Packing Company v. Murrah, 234 Miss. 494, 106 So. 2d 675, there was an absence of any evidence that Murrah was on a personal mission or errand of his own.

Of course, if Wilson had been going to Morton on the business of the partnership, and, on the way, expected to leave his niece at Whitfield, the dual purpose doctrine could be appropriately invoked. Primos v. Gulfport Laundry and Cleaning Company, 157 Miss. 770, 128 So. 507; Vestal & Vernon Agency, et al. v. Pittman, 219 Miss. 570, 69 So. 2d 227; Allen Dairy Products Company v. Whittington, 230 Miss. 285, 92 So. 2d 842. In that instance there would have been no deviation. The maps, introduced in evidence, show a good road from Pearl via Whitfield to Brandon and the intersection with Highway 80, which leads to Morton. But Mrs. Wilson testified positively that her husband did not make any remarks to her whatever about going to Morton to find Pope, who was delinquent in his account. The mere fact that he had on his person a memorandum of this account was of little, if any, probative value to establish Morton as his destination.

It must be borne in mind that it was the province of the triers of fact to resolve the issue as to whether or not Wilson, at the time of his death, was engaged in the business of his company or was on a private mission to deliver his niece to the Insane Hospital at Whitfield. They heard the witnesses and observed their demeanor. This Court cannot say that their conclusion was contrary to the great weight of the evidence or that it stemmed from error of law or fact. Consequently this Court is of the opinion that the learned trial judge was not warranted in setting aside the order of the Commission and granting an award in this case.

From which it follows that the judgment of the circuit court is reversed and a judgment will be entered here in favor of the appellants, denying any benefits to the appellees.

Reversed and judgment here for the appellants.

*Roberds, P. J.,* and *Hall, Kyle* and *Holmes, JJ.,* concur.