DENNIS DI COSALA, AN INFANT BY HIS GUARDIAN AD LITEM, BENITA DI COSALA, AND BENITA DI COSALA, INDIVIDU-ALLY, PLAINTIFFS-APPELLANTS, v. ROBERT M. KAY, PHIL-IP REUILLE, BRITISH SCOUTING ASSOCIATION AND JOHN TANTILLO, DEFENDANTS, AND ROBERT TREAT COUNCIL, BOY SCOUTS OF AMERICA AND BOY SCOUTS OF AMERICA, DEFENDANTS-RESPONDENTS.

Argued November 4, 1981—Decided August 4, 1982.

160

162

*William O. Barnes, Jr.* argued the cause for appellants.

*William L'E. Wertheimer* argued the cause for respondents (*Lum, Biunno & Tompkins,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

The primary question raised in this case is whether an employer owes a duty of reasonable care to third persons in the hiring and retention of employees whose aggressive or reckless characteristics or lack of competence in the performance of their employment duties may endanger such third persons.

I

On August 11, 1973, the plaintiff in this action, Dennis DiCosala, was accidentally shot in the neck by Robert M. Kay. At the time of the accident, the plaintiff was a child of only six years of age. The accident occurred in the living quarters of the plaintiff's uncle, defendant Philip Reuille, which were located on the grounds of Camp Mohican, a Boy Scout camp situated in Blairstown. Camp Mohican was owned and operated by the Robert Treat Council of the Boy Scouts of America. Reuille had

been hired as a camp ranger by that organization in the spring of 1971. His duties at the camp included repair work, maintenance chores, and other general work related to the operation of the summer camp. His compensation included the provision of accomodations on the camp grounds. The building in which he lived, Collinmore Lodge, also contained, in addition to Reuille's living quarters, a camp office and meeting hall.[1]

The Boy Scouts claim that the living quarters were regarded as Reuille's private dwelling within which he could entertain private house guests. David Greenlaw, a Robert Treat Council administrator, testified that his organization was well aware that Reuille did, in fact, entertain private guests in his quarters. Moreover, both the Robert Treat Council and the Boy Scouts of America note that they had no general access to Reuille's home and could enter it by invitation only.

On the other hand, despite the private nature of the dwelling, it was clear that representatives or employees of the two organizations had, in fact, been in the Reuille home on more than one occasion. For example, in 1973 Greenlaw had inspected Reuille's living quarters at Reuille's request because of "a bad water situation" in the building. Moreover, Greenlaw testified in a deposition that he visited the building occupied by the Reuille family approximately twice per month for business and social reasons. He also explicitly added that he had probably been in the quarters before August 1973 as recently as in June of that year, and that he was certain that other people connected with the Robert Treat Council had also visited Reuille in his quarters.

The plaintiff was present on the premises as part of an extended social visit that he and his mother, Benita, were paying to Philip Reuille and his wife, Bernice, who were the boy's uncle

---

[1]Philip Reuille's employment with Robert Treat Council was terminated in September of 1973, apparently as a result of unsatisfactory work performance. There is no indication whether his performance was unsatisfactory before the accident as well as subsequent to it.

and aunt. The boy and his mother apparently visited the Reuilles on a yearly basis.

During the most recent visit, the Reuilles had introduced Benita DiCosala to Robert Kay, who was employed as a counselor at the camp during the summer of 1973. He was, at the time of the incident, 19 years of age. He had obtained his counselor's position as part of an exchange program with the British Scouting Association, another defendant later named in this action. Kay received no salary for his work. He was, however, provided with room and board. His duties at the camp included instructing the scouts in mountaineering.

On the day of the accident, Kay went to the Reuille's home, at the invitation of Benita DiCosala, intending to take her and the plaintiff on a mountain hike. The record is fairly clear that Kay's visit and the planned hike were entirely social and unrelated to Kay's duties as a counselor at the camp. When the plaintiff's mother was unable to leave as planned, she, along with the young boy and Kay, went outside and played hide and go seek for about one-half hour. The three then went into the Reuille living quarters to pass the time. The young boy and Kay first went into the dining room. While there, they were "playing with a toy pistol and a .22 automatic pistol that he (Robert) had found on top of a cubbard (sic) in the dining room." They then moved into the living room, where Kay found another handgun in a holster on the fireplace mantel. He removed it and, despite Benita's warning, pointed it at plaintiff in play. Kay threatened the boy in jest, saying that he was naughty and if he did not behave, Kay would shoot him. Kay then pulled the trigger, apparently assuming that the gun was not loaded. The boy was struck in the neck by Kay's shot. While the record does not indicate the precise nature and extent of the boy's wound, it seems undisputed that he has suffered severe and crippling injuries.

Kay admitted all of the foregoing facts relating to the shooting in a statement that he gave to the police shortly after the

occurrence. Other facts on the record establish that the revolver used in the shooting was not the only gun on the Reuille premises.[2] Benita DiCosala testified that she had seen more than one gun—both rifles and revolvers—laying around the Reuille home before the date of the shooting. She had seen them in the front room, in the dining area, and in Philip Reuille's office on the other side of the house. Moreover, the police found the additional gun described in Kay's police statement during their search of the premises immediately after the shooting. Finally, Greenlaw stated he was aware of the presence of firearms in the Reuille home, although when asked, he could remember neither how many guns there were nor where on the premises they were located.[3] Nonetheless, he expressly admitted having seen them in Reuille's personal quarters.[4]

Dennis DiCosala and his mother filed a civil action in the Superior Court against the following six defendants: Boy Scouts of America, the Robert Treat Council, Robert Kay, the British Scouting Association, Philip Reuille and John Tantillo. Only the two defendants currently before this Court—the Boy Scouts and the Robert Treat Council—responded. Default judgments were entered against the remaining defendants.

The Boy Scouts and the Robert Treat Council moved for a summary judgment on the following two grounds. First, they

[2]The handgun used in the shooting was owned by another individual, defendant John Tantillo, who had loaned it to Reuille.

[3]Reuille did not have a permit for the revolver, nor did he have a Firearms Identification for either of them. It should also be noted that there is an express Boy Scout regulation prohibiting the possession of firearms on the camp premises. The parties dispute, however, whether this regulation applied to rangers such as Reuille.

[4]Greenlaw also testified that there was a rifle range on the Boy Scout premises and that he had spoken with Reuille about the use of the latter's guns on that range. There were specific rules required by the Boy Scouts to be followed in the use of the rifle range such as, for example, the requirement that a member of the National Rifle Association be present. This information further confirms the Boy Scouts' knowledge of the existence of the guns.

argued that since, as a matter of law, neither Kay nor Reuille had been acting within the scope of his employment in connection with the shooting, the two defendants could not be liable on the basis of the doctrine of *respondeat superior.* Second, the two defendants argued that even if the alleged negligence of Kay or Reuille could be imputed to them in their capacity as employees, they were nevertheless immune from liability by virtue of *N.J.S.A.* 2A:53A–7, which exempts nonprofit entities from liability for negligence where the individual who suffered the wrong is a "beneficiary" of the entities' works, as opposed to a person who is "unconcerned in and unrelated to and outside of the benefactions" of them.

The trial court granted defendants' motion for summary judgment. He first concluded that the conduct of both Kay and Reuille fell outside the scope of employment as contemplated within the common law doctrine of *respondeat superior* and within Section 228 of the Restatement Second of Agency. He stated that he did not see any purpose to serve the master and, further, that there was nothing to indicate the conduct was "even vaguely authorized." On the other hand, he rejected the defendants' contentions regarding the immunity statute, concluding that it was not applicable because the plaintiff was not a beneficiary of the charitable entities.[5]

In granting the summary judgment motion, the trial court rejected the plaintiff's argument that the defendants were liable because they had negligently hired Kay or Reuille. While holding that a cause of action based on negligent hiring did exist under New Jersey law, the trial judge nevertheless concluded that the plaintiffs had failed to show any factual basis on which to support the legal conclusion that either of the two employees had been negligently hired or retained. Moreover, the fatal defect in the plaintiffs' showing, according to the trial court,

---

[5]None of the parties has challenged the trial court's ruling regarding the immunity issue. Accordingly, we decline to disturb that aspect of its holding.

was that they had failed to demonstrate the existence of a duty owed by either of the defendants to Dennis DiCosala, who was, concededly, a guest not of the camp, but of Reuille as a private individual.

In a brief *per curiam* opinion, the Appellate Division affirmed for substantially the reasons stated by the trial court.[6] We granted plaintiffs' petition for certification. 87 *N.J.* 375 (1981). We reverse the Appellate Division's affirmance of summary judgment and remand this matter to the trial court for further proceedings consistent with this opinion.

## II

In reviewing the dismissal of claims as legally insufficient on a motion for summary judgment, we must accept as true all of the allegations in the pleadings, the affidavits and the discovery submitted on the behalf of the opponent of the motion. We also draw all reasonable inferences most favorable to that party. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75 (1954).

Initially, we consider the plaintiffs' argument that the defendants herein may be liable under the doctrine of *respondeat superior.* Their claim, in essence, is that under that doctrine, an employer may be liable if the actions of its employee either are within the scope of employment or could have been reasonably foreseeable by the employer, whether those actions be criminal or tortious.

The doctrine of *respondeat superior* has traditionally been thought to render the employer liable for torts of one of its

---

[6]The trial court, apparently on its own initiative, questioned counsel regarding another possible theory of recovery, namely, that the Robert Treat Council and the Boy Scouts were negligent in their capacity as Reuille's landlords. The theory is that in this capacity the defendants, knowing of the tenant's propensity for guns, had some sort of duty to guests of the tenant. Both the trial court and the Appellate Division rejected this argument, and the plaintiffs do not challenge those determinations.

employees only when the latter was acting within the scope of his or her employment. *Gilborges v. Wallace,* 78 *N.J.* 342, 351 (1978); *Wright v. Globe Porcelain Co.,* 72 *N.J.Super.* 414, 418 (App.Div.1962); W. Prosser, *Law of Torts,* 460–61 (4th ed. 1971). The scope of employment standard, concededly imprecise, is a formula designed to delineate generally which unauthorized acts of the servant can be charged to the master. *Id.* Furthermore, the standard

> refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. [*Id.*]

See *Roth v. First National State Bank of New Jersey,* 169 *N.J.Super.* 280 (App.Div.), certif. den., 81 *N.J.* 338 (1979). Conduct is generally considered to be within the scope of employment if, "it is of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master." *Restatement (Second) of Agency* § 228 (1957). See also *id.* at § 229 (kind of conduct within scope of employment).

■ No facts were presented by the plaintiffs to suggest that either Kay's alleged negligence in shooting the plaintiff or Reuille's alleged negligence in leaving a loaded handgun in his quarters on the premises of a Boy Scout camp were within the scope of the employment of either Kay or Reuille. The boy was in the Reuille quarters as part of a purely social visit; Kay's actions toward the boy and his mother were similarly purely socially motivated. Accordingly, we affirm the granting of defendant's summary judgment motion in connection with the plaintiffs' *respondeat superior* claim.

### III

As noted, the trial court assumed that there exists a cognizable wrong under New Jersey law regarding the negligent hiring or retention of an employee. In reaching this conclusion, it

relied exclusively on a reported case in the Federal District Court of New Jersey. *Nivins v. Sievers Hauling Corp.*, 424 *F.Supp.* 82 (D.N.J.1976). Since, as was noted by the *Nivins* court, no New Jersey case has squarely addressed this issue, we turn first to the question of the correctness of the trial court's conclusion that New Jersey recognizes such a cause of action.

A majority of jurisdictions that have addressed this issue have concluded that an employer who negligently either hires or retains in his employ an individual who is incompetent or unfit for the job, may be liable to a third party whose injury was proximately caused by the employer's negligence. Representative of this view are *F. & T. Company v. Woods*, 92 *N.M.* 697, 594 *P.2d* 745 (1979) and *Murray v. Modoc State Bank*, 181 *Kan.* 642, 313 *P.2d* 304, 309–12 (1957).[7] See generally 53 *Am.Jur.2d, Master and Servant,* § 422 (1970); 57 *C.J.S. Master and Servant* § 559 (1948); Annot. "Hospital's Negligence in Selecting Doctor," 51 *A.L.R.3d* 981 (1973).

The reasoning that has impelled the recognition of this cause of action in most jurisdictions follows from tort principles of negligence and foreseeability as well as from firmly established principles of agency and vicarious liability. An employer whose

---

[7]Other decisions recognizing this cause of action are: *Estate of Arrington v. Fields*, 578 *S.W.2d* 173, 178 (Tex.Civ.App.1979); *Evans v. Morsell*, 284 *Md.* 160, 395 *A.2d* 480, 483–84 (1978); *Hathcock v. Mitchell*, 277 *Ala.* 586, 173 *So.* 2d 576, 584 (1965); *Wishone v. Yellow Cab Co.*, 20 *Tenn.App.* 229, 97 *S.W.2d* 452 (1936); *Colwell v. Oatman*, 32 *Colo.App.* 171, 510 *P.2d* 464 (1973); *Mallory v. O'Neil*, 69 *So.2d* 313, 315 (Fla.1954); *Schulte v. Pyle*, 95 *Ga.App.* 229, 97 *S.E.2d* 558 (1957); *Stone v. Hurst Lumber Company*, 15 *Utah* 2d 49, 386 *P.2d* 910 (1963); *Dayton Hudson Corp. v. American Mut. Lia. Ins.*, 621 *P.* 2d 1155 (Okl.1980); *Williams v. Feather Sound, Inc.*, 386 *So.2d* 1238 (Fla.App. 1980), pet. for rev. den. 392 *So.2d* 1374 (Fla.1981); *C. K. Sec. Systems v. Hartford Acc. & Indem.*, 137 *Ga.App.* 159, 223 *S.E.2d* 453 (1976); *Strauss v. Hotel Continental Co., Inc.*, 610 *S.W.2d* 109 (Mo.App.1980); *Weiss v. Furniture in the Raw*, 62 *Misc.2d* 283, 306 *N.Y.S.2d* 253 (Civ.Ct.1969). See *Dayton-Hudson Corp. v. American Mut. Liability Ins.*, 526 *F.Supp.* 730 (W.D. Okl.1981); *Coath v. Jones*, 277 *Pa.Super.* 479, 419 *A.2d* 1249, 1250 (1980). But see, *e.g.*, *Lange v. B & P Motor Express, Inc.*, 257 *F.Supp.* 319 (N.D.Ind. 1966).

employees are brought into contact with members of the public in the course of their employment is responsible for exercising a duty of reasonable care in the selection or retention of its employees. Comment d to § 213 of the *Restatement (Second) of Agency* discussed these principles in the following manner:

> d. *Agent dangerous.* The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor...
>
> The dangerous quality in the agent may consist of his incompetence or unskillfulness due to his youth or his lack of experience considered with reference to the act to be performed. An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity...
>
> One who employs another to act for him is not liable under the rule stated in this Section merely because the one employed is incompetent, vicious, or careless. If liability results it is because, under the circumstances, the employer has not taken the care which a prudent man would take in selecting the person for the business at hand. What precautions must be taken depend upon the situation. One can normally assume that another who offers to perform simple work is competent...
>
> Liability results under the rule stated in this Section ... because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm.

In short, persons must use reasonable care in the employment of all instrumentalities—people as well as machinery—where members of the public may be expected to come into contact with such instrumentalities. See Comment e. to *Restatement (Second) of Agency* § 213 ("One who engages in an enterprise must take care to see that all the instrumentalities, human or mechanical, which he uses are such as are not likely to cause harm to third persons"); *Freeman v. Bell,* 366 *So.*2d 197 (La. App.), *cert.* den., 369 *So.*2d 151 (La.1979) (owner of a public place

owes patrons duty to exercise reasonable care to protect them from harm from employees).

Most courts that have recognized the existence of this tort do not confine liability within the narrower principles of *respondeat superior,* which require that the wrongful employee's conduct be within the scope of his or her employment. *E.g. Svacek v. Shelley,* 359 *P.*2d 127 (Alaska 1961); *Stricklin v. Parsons Stockyard Co.,* 192 *Kan.* 360, 388 *P.*2d 824, 829 (1964); *Porter v. Thompson,* 357 *Mo.* 31, 206 *S.W.*2d 509 (1947); *Eifert v. Bush,* 272 *N.Y.S.*2d 862, 865, 51 *Misc.*2d 248 (Sup.Ct.1966); *Dempsey v. Walso Bureau, Inc.,* 431 *Pa.* 562, 246 *A.*2d 418 (1968). See also *Restatement (Second) of Torts,* § 317 (1963) (Duty of Master to Control Conduct of Servant) ("A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them" under certain circumstances; Comment a expressly provides that the rule is applicable only when the servant is acting outside the scope of his employment). But see, *e.g., Burgert v. Union Pacific Railroad Company,* 240 *F.*2d 207, 212 (8 Cir. 1957); *Morse v. Jones,* 223 *La.* 212, 65 *So.*2d 317 (1953).

The tort of negligent hiring or failure to fire addresses a different wrong from that sought to be redressed by the *respondeat superior* doctrine. One court has stated that:

> One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the wilfull act of the employee beyond the scope of his employment. [*Fleming v. Bronfin,* 80 *A.*2d 915, 917 (D.C.Mun. App.1951) ].

Thus, the tort of negligent hiring addresses the risk created by exposing members of the public to a potentially dangerous individual, while the doctrine of *respondeat superior* is based on the theory that the employee is the agent or is acting for the employer. Therefore the scope of employment limitation on

liability which is a part of the *respondeat superior* doctrine is not implicit in the wrong of negligent hiring.

Accordingly, the negligent hiring theory has been used to impose liability in cases where the employee commits an intentional tort, an action almost invariably outside the scope of employment, against the customer of a particular employer or other member of the public, where the employer either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons. See *Hersh v. Kentfield Builders, Inc.,* 385 *Mich.* 410, 189 *N.W.*2d 286, 288 (1971); *LaLone v. Smith,* 39 *Wash.*2d 167, 234 *P.*2d 893 (1951); *Priest v. F. W. Woolworth Five & Ten Cent Store,* 228 *Mo.App.* 23, 62 *S.W.*2d 926 (1933); *Murray,* 313 *P.*2d at 309. See generally, Annot. "Employer's Knowledge of Employee's Past Criminal Record as Affecting Liability for Employees Tortious Conduct," 48 *A.L.R.*3d 359 (1972); Annot., "Assault by Servant," 34 *A.L.R.*2d 372, 390 (1954) (§ 9 Negligence; selection or retention of employee). Compare *Gilborges v. Wallace,* 78 *N.J.* at 351; *Roth v. First National State Bank,* 169 *N.J.Super.* at 286 (employer liable under the doctrine of *respondeat superior* for consciously criminal or tortious acts of its employee only where done "for the master's purposes or reasonably expectable by the latter").

 Consistent with these principles, the tort of negligent hiring has as its constituent elements two fundamental requirements. The first involves the knowledge of the employer and foreseeability of harm to third persons. An employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons. See *F. & T. Company v. Woods,* 594 *P.*2d at 747; *Eagle Motor Lines v. Mitchell,* 223 *Miss.* 398, 78 *So.*2d 482, 486–87 (1955); *Thompson v. Havard,* 285 Ala. 718, 235 *So.*2d 853, 858 (1970); *Dempsey,* 246

A.2d at 422; *Evans*, 395 A.2d at 483. The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury. *Hathcock v. Mitchell*, 277 *Ala.* 586, 173 *So.*2d 576, 584 (1965).

■ We now expressly recognize the tort of negligent hiring or retention of an incompetent, unfit or dangerous employee and hold that one may be liable for injuries to third persons proximately caused by such negligence. Consistent with the majority of jurisdictions that have also recognized this tort, we further hold that the employee conduct which may form the basis of the cause of action need not be within the scope of employment. The wrong here redressed is negligence of the employer in the hiring or retention of employees whose qualities unreasonably expose the public to a risk of harm.

## IV

■ The trial court assumed the viability of a cause of action based on negligent hiring. Its granting of the motion for summary judgment was premised upon its view that, as a matter of law, the defendants owed no duty to this plaintiff since he was on the camp grounds purely as a social guest and for reasons that were unrelated to the employment of either Kay or Reuille. The error in the trial court's approach lies in its assumption that the extent of the duty owed by the negligent employer was limited to situations within the scope of the employment of the employees. However, the duty owed is properly to be determined by whether the risk of harm from the dangerous employee to a person such as the plaintiff was reasonably foreseeable as a result of the employment.

The analysis to be followed in determining the existence of a duty under these circumstances can be derived from *Hill v. Yaskin*, 75 *N.J.* 139 (1977). The issue in that case was whether the owner of a stolen vehicle and the operator of the lot in which it had been parked could be liable to a third party who

was subsequently injured in a car chase involving the stolen vehicle, where the two defendants had permitted the car to remain unattended with its ignition key accessible to the thief.

We stated that in order to ascertain the existence *vel non* of a duty owed by a defendant, it is necessary to determine whether or not probable harm to one in the position of the injured plaintiff should reasonably have been anticipated from defendant's conduct. 75 *N.J.* at 143; *McGlynn v. Newark Parking Authority,* 86 *N.J.* 551, 560 (1981). Thus, the issue of duty owed to a plaintiff is a question of foreseeability.

We further noted that the issue of foreseeability in this sense "must be distinguished from the issue of foreseeability as that concept may be said to relate to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff was a reasonably foreseeable result so as to constitute a proximate cause of the injury." *Yaskin,* 75 *N.J.* at 143. See generally *Prosser, supra,* §§ 42, 43 at 244–70. This Court has recognized a critical distinction between foreseeability necessary to create a legal duty and foreseeability necessary to establish proximate cause.

With respect to the former, we stated that:

damages for an injury resulting from a negligent act of the defendant may be recovered if a reasonably prudent and careful person should have anticipated, under the same or similar circumstances, that injury to the plaintiff *or to those in a like situation would probably result. The most common test of negligence, therefore, is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts.* [*Hill v. Yaskin,* 75 *N.J.* at 144 quoting 57 *Am.Jur.2d Negligence* § 58 (1970) (emphasis added)]

In situations involving an unreasonably "enhanced hazard," *id.* at 144–45, the key to duty depends upon the concept of foreseeability based upon ordinary human experiences. This does not require a specific forecasting of particularly identifiable victims or a precise prediction of the exact harm that may result from the conduct. Rather, we have recognized that a party may be liable to persons who fall normally and generally within a zone of risk created by the particular tortious conduct. *E.g.,*

*Hill v. Yaskin, supra; Stewart v. 104 Wallace St., Inc.*, 87 *N.J.* 146 (1981); *Schroeder v. Perkel*, 87 *N.J.* 53, 63 (1981); *McGlynn*, 86 *N.J.* at 560–61; *Portee v. Jaffee*, 84 *N.J.* 88 (1980); *Rappaport v. Nichols*, 31 *N.J.* 188 (1959); *Wytupeck v. Camden*, 25 *N.J.* 450, 460–63 (1957). See also *Collins v. Arkansas Cement Company*, 453 *F.*2d 512, 515 (8 Cir. 1972). Similarly, a party will be liable to persons foreseeably exposed to danger when the injury suffered was generally to be anticipated, although it was not the exact or most likely kind of injury that could have been predicted. *E.g. Butler v. Acme Markets*, 89 *N.J.* 270 (1982); *Trentacost v. Brussel*, 82 *N.J.* 214 (1980); *Meade v. Kings Supermarket-Orange*, 71 *N.J.* 539 (1976); *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368 (1975); *Falzone v. Busch*, 45 *N.J.* 559 (1965); see also *Roberts v. United States*, 316 *F.*2d 489, 495 (3 Cir. 1963) (applying New Jersey law).

In applying these principles to this case, we note that, contrary to the conclusion reached by the courts below, the lack of a duty predicated upon the legal status of the infant plaintiff, or otherwise arising out of an independent legal relationship between the parties, is not determinative. Thus, we have recently observed that the existence of a duty to exercise reasonable care need not be determined solely by the status or legal relationship between the parties, even if otherwise relevant. That determination should be made by taking into account all of the surrounding circumstances. *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 461–63 (1981); *Eden v. Conrail*, 87 *N.J.* 467, 473–75 (1981). Justice Schreiber, concurring in *Eden*, noted that Professor James has "advocat[ed] the elimination of the common law rule determining duty on the basis of classification and deciding instead whether the property owner's activities constitute an unreasonable danger under all the circumstances." *Id.* at 476, discussing F. James, "Tort Liability of Occupiers of Land: Duties Owed to Trespassers," 53 *Yale L.J.* 144, 177–79 (1953). "Ultimately . . . the imposition of a duty depends upon policy considerations such as the effect of the imposition of the risks and burdens of an activity." *McGlynn,*

86 *N.J.* at 560. As has been noted in this as well as other contexts, "[w]hether a duty exists is ultimately a question of fairness." *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962).

In sum, the mere fact that the young boy was a private guest of Reuille as opposed to being a client of the Boy Scout Camp does not in itself end the requisite inquiry. Rather, in order to determine whether the defendants owed a duty to the plaintiff to exercise reasonable care in the selection and retention of their employees, we must inquire whether a reasonably prudent and careful person, under the same or similar circumstances, should have anticipated that "an injury to the plaintiff or to those in a like situation would probably result" from his conduct. *Yaskin,* 75 *N.J.* at 144. Stated somewhat differently, the question presented is whether the employer, knowing of its employee's unfitness, incompetence or dangerous attributes when it hired or retained its employee, should have reasonably foreseen the likelihood that the employee through his employment would come into contact with members of the public, such as the plaintiff, under circumstances that would create a risk of danger to such persons because of the employee's qualities.

We conclude that the defendants owed a duty to this plaintiff to exercise reasonable care in the hiring and retention of their employees. The present record presents controverted material facts and strong inferences which, if properly adduced at a trial, would provide a basis for liability against defendants.

As previously noted, one requisite predicate for positing liability against defendants in their capacities as employers under the negligent hiring cause of action is their knowledge of the employee's dangerous characteristics and the reasonable foreseeability of harm to other persons as a result of these qualities. *Supra* at 173–174. The second element of the cause of action relates to proximate cause, which involves the foreseeability of the injury which was suffered by the plaintiff.

The record adequately discloses facts indicative of the foreseeability of the accident which actually befell plaintiff and which would support liability. Defendants knew of Reuille's possession and use of guns. They also provided Reuille with housing on the premises of the Boy Scout Camp in connection with his employment. While it is claimed that these lodgings were not generally accessible to other persons present at the camp, they were part of common facilities that were used by others associated with the camp. In addition, Reuille had frequent contact with such persons and it was foreseeable that they might be invited to his living quarters. Further, it was foreseeable that Reuille would entertain guests in his home and the Boy Scouts had actual notice of this. From the standpoint of foreseeability, the status of such guests in Reuille's home would not differ materially from any other person connected with the camp who might be in the same position. Therefore, that the plaintiff here did not have the status of a scout or camper is not determinative. Though plaintiff's presence at Reuille's lodgings was not technically a circumstance within the actual scope of employment or an incident to the performance of employment duties, plaintiff clearly was exposed to the "enhanced hazard" and fell within the "zone of risk" created through defendants' employment of Reuille and the dangerous condition that existed at the Reuille home which was furnished as part of his employment. As such, harm to plaintiff was foreseeable and, therefore, defendants were under a duty to him to exercise reasonable care in choosing to retain Reuille as an employee on their campgrounds.

Under the circumstances, the grant of summary judgment in defendants' favor was in error and must be reversed so that the claims can be resolved in a plenary trial.

V

In light of the necessity for a remand, it is appropriate to note another aspect of the case. Plaintiffs alleged that the

defendants were negligent in failing to supervise properly the activities of Reuille and in permitting loaded firearms, dangerous instrumentalities, to be maintained upon its campground. The gist of these allegations is that the Robert Treat Council of the Boy Scouts of America, as owner of the premises on which the accident occurred, had control over the building in which Reuille lived. It is possible that while the trial court may have properly granted summary judgment on conventional landlord-tenant principles, the facts are sufficiently controverted as to the type of control defendants retained over their premises, including Reuille's lodgings, that the defendants may have been under a duty to exert continuing control over the safety of Reuille's living quarters. The structure in which Reuille had living quarters was a lodge in which the campers assembled in a meeting hall. It also included a camp office, probably frequented by campers and visitors. Furthermore, the record is not clear whether Reuille had been granted living quarters on the camp-site in order to be more readily available to carry out his duties as a ranger or whether the quarters had been made available for his convenience. It is therefore entirely possible that the Council had a special interest and responsibility as to activities carried on in the entire building because of its location. The pleadings and conflicting facts permit the development of a cause of action addressed to the unique situation where the owner and operator of the camp owed an obligation to see to it that a dangerous instrumentality, such as a firearm, be removed or safeguarded and secured. *Cf. Mazzilli v. Selger,* 13 *N.J.* 296 (1953) (recognizing liability of defendant in control of home when her nine-year-old son accidentally shot plaintiff with a shotgun that had not been safeguarded).

It is relevant to point out, in this regard, that the accident occurred through the use of a gun. It has often been held that a greater degree of care is required with respect to dangerous instrumentalities. *E.g., Black v. Public Service Elec. & Gas Co.,* 56 *N.J.* 63, 72 (1970); *McAndrew v. Mularchuk,* 33 *N.J.* 172, 183 (1960); *Peer v. Newark,* 71 *N.J.Super.* 12 (App.Div.1961), certif.

den., 36 *N.J.* 300 (1962). In addition, courts of this state have long-recognized that a higher degree of care is often required to be exercised toward young children than to adults similarly situated. *Garafola v. Rosecliff Realty Co., Inc.,* 24 *N.J.Super.* 28 (App.Div.1952); *Friedman v. Snare & Triest Co.,* 71 *N.J.L.* 605, 611 (E. & A.1905). This is especially important in this case where defendants' use of their premises involve the presence of children and Reuille's employment directly involved contact with children.

Accordingly, we reverse the judgment in favor of the defendants and remand the case for trial on the merits.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For affirmance*—None.