# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0180-20

J.P., a minor, by his mother, S.A.,
as Guardian Ad Litem for J.P.,
and S.A., individually,

      Plaintiffs-Appellants,

v.

LAWRENCE TOWNSHIP BOARD
OF EDUCATION, DR. PHILIP
MEARA, Superintendent Lawrence
Township Public Schools, DR.
CRYSTAL LOVELL,
Superintendent Lawrence Township
Public Schools, DAVID ADAM,
Principal of the Lawrence
Township Intermediate School,
DR. LAURA WATERS,
Assistant Superintendent of the
Lawrence Township Public Schools,
MADELYN MCGUIRE, a Child
Study Team Member at the
Lawrence Township Intermediate
School, "JOHN" MIELCAREK, a
General Education Teacher of the
Lawrence Township Intermediate
School, SUSAN DOUGLAS, a
Teacher at the Lawrence Township
Intermediate School, DONNA M.

LEWIS, a Child Study Team Member at the Lawrence Township Intermediate School, ELIZABETH MAYO, a Child Study Team Member at the Lawrence Township Intermediate School, ELLICE WARNER, a Child Study Team Member at the Lawrence Township Intermediate School, HARRIET HIRSCHFELD, Manager of After School Programs of the Lawrence Township School District, WENDY DONAHUE, Personnel Specialist Operations Manager of the Lawrence Township School District,

 Defendants-Respondents,

and

PRINCETON FAMILY YMCA, their teachers, members, employees, agents, servants and/or volunteers, MATT BOYD, individually and as Youth & Family Assistant, for Princeton Family YMCA, KEITH WALSH, individually and as Sr. Program Director for Princeton Family YMCA, KATE BECH, individually and as Chief Executive Officer for Princeton Family YMCA, and JOSEPH MILLER, individually and as a teacher, member, employee, agent, servant and/or volunteer of the Lawrence Township Public Schools and/or Princeton Family YMCA,

A-0180-20

Defendants.

Submitted January 25, 2022 – Decided March 18, 2022

Before Judges Currier, DeAlmeida, and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0273-15.

Gregory G. Gianforcaro and Daniel B. Shapiro, attorneys for appellants.

Anderson & Shah, LLC, attorneys for respondents (Jessica M. Anderson, on the brief).

PER CURIAM

Plaintiffs appeal from the trial court orders granting the school defendants[1] partial summary judgment and subsequently dismissing the remaining counts on a motion for reconsideration, and the order denying plaintiffs' motion for reconsideration. After reviewing the record in light of the contentions advanced on appeal and the applicable principles of law, we affirm.

I.

S.A. is the mother of J.P., who is autistic. At the time of these events, J.P. was attending Lawrenceville Intermediate School (LIS) and placed in a self-

---

[1] We refer to respondents Lawrence Township Board of Education and its employees as the school defendants or BOE.

 A-0180-20

contained multiple-disabilities classroom pursuant to his individualized education program. Defendant Joseph Miller was one of the aides in J.P.'s fifth-grade classroom during the 2009-2010 academic year. He had been employed by the Lawrence Township Board of Education since 2006. Miller also worked at defendant Princeton Family YMCA in its after-care program. He was hired by the YMCA in 2010.

At the conclusion of the 2010-2011 academic year, S.A. contacted the child study team and requested that J.P. and his brother[2] be placed in a full-day extended school year services program (ESY) during the summer. In response, the child study team offered a half-day program. When S.A. renewed her request for the full-time program because of her work schedule, a child study team member told her that "Miller was going to be the lead teacher in the extended school year program" and he "would be willing to watch [her] boys." According to S.A., a teacher at the school told her that Miller was a "sweetheart."

S.A. enrolled J.P. in the ESY program, where Miller was the lead teacher. Because of the child study team member's recommendation, S.A. stated she also hired Miller to babysit her sons in the afternoon after the half-day ESY program finished. Miller brought the boys in his car to either their house or his own

---

[2] S.A.'s younger son is also autistic.

house after the program and stayed with them for the remainder of the afternoon until S.A. returned home. S.A. continued this arrangement with Miller, where he would take the boys after school, until October 2011.

In November 2011, after reading a news article about a sexual abuse scandal, S.A. asked J.P. and his brother if they had "ever showered with an adult," to which J.P. responded, "Yes, with Mr. Miller." She then asked J.P. if Miller was naked in the shower with him, to which J.P. responded, "Yes." J.P.'s brother confirmed he had seen J.P. and Miller showering together. J.P. was eleven years old at the time of these events.

S.A. and defendant Ellice Warner, J.P.'s behavioral specialist, contacted the Lawrence Township Police. J.P. told the police he had been sexually abused by Miller during the summer and fall of 2011. During his deposition, J.P. testified that the abuse included showering with Miller, performing oral sex on him, mutual masturbation, and Miller had digitally penetrated J.P.'s anus. J.P. said the abuse took place at his house and at Miller's house; none of the abuse

took place at the school. Miller was subsequently arrested and charged with several counts of sexual assault and endangering the welfare of a child.[3]

S.A. testified during her deposition that she did not know if the school defendants were aware that Miller was a pedophile or had sexual propensities toward minor children.

## II.

In their fifth amended complaint, plaintiffs alleged the following claims against the school defendants: negligent hiring, supervision, training, and retention of Miller (the negligent hiring claim); negligence proximately caused by an act or omission of a public employee within the scope of their employment; breach of fiduciary duty; and S.A.'s claim for per quod damages.[4]

In a March 7, 2019 order, the court granted the school defendants partial summary judgment, dismissing all counts of the complaint except the negligent hiring claim. Later that month, the school defendants moved for reconsideration of the denial of summary judgment on plaintiffs' negligent hiring claim. On

---

[3] According to the fifth amended complaint, Miller pleaded guilty to two counts of second-degree endangering the welfare of a child. He was sentenced to parole supervision for four years, and his teaching license was revoked.

[4] The complaint contained additional claims against the school defendants. Because plaintiffs did not oppose the dismissal of those claims at the time of the summary judgment motion, we need not address them.

A-0180-20

October 18, 2019, the court granted reconsideration to the school defendants, dismissing the remaining count of the complaint.

Thereafter, plaintiffs moved for reconsideration of the dismissal of the negligent hiring claim. On June 10, 2020, the court denied the motion.[5]

III.

Because the appeal concerns the school defendants' hiring of Miller, we detail those facts derived from the record.

Miller initially applied for a position with the school defendants' afterschool program, submitting a cover letter, resume, and list of references. Harriet Hirschfeld, manager of the afterschool program, interviewed Miller in 2006. In reviewing his resume, she noted he was a college graduate. She stated during her deposition that it "was important that he had a college degree, and that based on the experience that I saw that he would be a good monitor." She admitted she did not actually "check to see if [Miller] was a college graduate because ultimately it wasn't really a criteria for the position."

---

[5]  In August 2020, plaintiffs settled their claims with the YMCA and its employees. Plaintiffs also voluntarily dismissed their claim against Miller.

Hirschfeld did not request or review Miller's college transcript prior to making her recommendation to the BOE. During discovery, the production of Miller's college transcript revealed that his name was formerly Joseph Prunetti.

Hirschfeld also did not question Miller about the eight-year gap in his resume between his college graduation date and his first job. She testified that even in hindsight she probably would not have asked him about it because she "didn't think it was significant."

Hirschfeld testified that she did not contact any of Miller's prior employers. The resume listed Nature's Classroom, a day camp, as Miller's third most recent employer—he worked there from 2002 to 2004. During discovery, the parties learned Nature's Classroom had terminated Miller in March 2004 for making inappropriate comments and sending an inappropriate email to a minor student.

Hirschfeld did contact three of the four references Miller listed. She explained that "[t]ypically . . . I use the references and as long as the three references clear my job is just to say that on paper he looks like he's a good employee and then . . . I turn it over so that he can get clearance, crime clearance." She further stated that she only interviews an applicant and makes a recommendation: "I can only say he looks good on paper and then refer it to

8

the [BOE], and they meet and then they review the documents and decide . . . after doing the crime clearances, [whether to] approve him or not, it's up to the [BOE], not me really."

In accordance with her procedure, Hirschfeld referred Miller's employment application for a criminal background check. He was fingerprinted and processed through the New Jersey State Police and the Federal Bureau of Investigation. In November 2006, the Director of the Criminal History Review Unit of the State of New Jersey Department of Education confirmed that Miller cleared a criminal background check and was "approved for public school employment in accordance with [the applicable statutes]." The BOE hired Miller in December 2006 and approved him for various staff positions within the school district through 2011, including substitute teacher and classroom aide for special education students.

During discovery, other employees of the BOE were questioned regarding their hiring practices. Wendy Donahue, the then-Lawrence Township School District personnel manager, testified that she also interviewed Miller. In discussing the background check, she explained it was the BOE's "policy" to "call the most recent employer and anyone who was presently supervising him

9

at that time and we were to call three references . . . ." She was not aware whether anyone had contacted Miller's most recent employer or supervisor.

Miller received excellent evaluations throughout his employment with the BOE. Tonja Brown, Miller's supervisor, evaluated him for his position as a classroom aide on April 27, 2011. She gave Miller a rating of "Excellent" in all categories, and, in her comments said:

> Mr[.] Miller is kind, caring and has a special gift that he shares with his students[.] He enhances their self-esteem and teaches them to believe that they can do anything[.] This is all above the academic credentials that he brings. In addition, Mr. Miller works very well with the classroom teacher[.] He is to be commended for his contribution to the classroom, students and school wide community[.]

Miller was also well-liked and respected by his co-workers. Susan Douglas, a sixth-grade teacher who worked with Miller for three years, told investigating police she was "shocked" to learn about the allegations of sexual abuse. She could not "believe it," and said "this could not be the person I have known for three years." According to Douglas, no one had ever complained about the way Miller taught or attended to the children in her class, and she had "never" observed or had it brought to her attention that Miller may have touched or done anything inappropriate with a student.

10

Similarly, when police questioned Warner about Miller, she said: "He is a nice guy. He does a good job in [the sixth grade] class. I would have never thought that something like this could have occurred." Hirschfeld also testified there were no prior issues with Miller.

Before learning of the sexual assault, S.A. too thought very highly of Miller. In the fall of 2011, she wrote an article for Autism New Jersey, entitled "Everyday Autism," wherein she praised Miller, calling him "a fantastic teacher" for her two boys. She wrote, "[t]he boys are so comfortable with [Miller] because of his no-nonsense and warm-hearted demeanor. Their eyes light up when he is around." "To me, he is the definition of a skilled and compassionate professional."

## IV.

On appeal, plaintiffs contend the trial court erred in dismissing their negligent hiring claim on summary judgment and in denying their subsequent motion for reconsideration.

We "review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). Summary judgment should be granted when, considering the competent evidence presented, viewed in the

A-0180-20

light most favorable to the non-moving party, there is "no genuine issue as to any material fact challenged" and "the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995).

A.

Plaintiffs contend the school defendants breached the duty of care owed to J.P. as established in Frugis v. Bracigliano, 177 N.J. 250 (2003). They assert the school defendants breached their duty of care by failing to properly vet and hire Miller, who posed a danger to the students in their care. Plaintiffs argue the school defendants had an obligation to do more than just rely on a criminal background check. They further contend the school defendants violated their own policies, which supports their breach of duty and a finding of liability for their negligence.

In a negligent hiring claim, "before recovery may be had, a duty must exist in law and a failure in that duty must be proved as a fact." Johnson v. Usdin Louis Co., 248 N.J. Super. 525, 529 (App. Div. 1991) (internal quotations omitted) (quoting Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 379 (App. Div. 1956)). "[W]hether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a question of fairness or policy."

12

Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991); Jerkins v. Anderson, 191 N.J. 285, 294 (2007) (noting that "[w]hether a duty of care exists is a question of law that must be decided by the court"); Johnson, 248 N.J. Super. at 529 (recognizing the same).

"Whether a person owes a duty of reasonable care toward another" depends upon whether imposing "such a duty satisfies an abiding sense of basic fairness" considering all of the circumstances and public policy. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993) (citing Goldberg v. Hous. Auth., 38 N.J. 578, 583 (1962)).

> In determining whether a duty exists, courts must weigh and balance several factors, including the foreseeability and severity of the risk of harm, the opportunity and ability to exercise care to prevent the harm, the comparative interests and relationships between or among the parties and, ultimately, fairness and public policy.
>
> [Riley v. Keenan, 406 N.J. Super. 281, 291 (App. Div. 2009) (citing J.S. v. R.T.H., 155 N.J. 330, 337 (1998)). See also Dunphy v. Gregor, 136 N.J. 99, 108 (1994) ("Ultimately, whether a duty exists is a matter of fairness.").]

It is well-established that school officials owe a duty to exercise reasonable care to schoolchildren and their parents to protect the children and

prevent endangerment or exploitation of them. <u>Frugis</u>, 177 N.J. at 268. As the Court stated in <u>Frugis</u>,

> The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators <u>during school hours</u>. <u>While their children are educated during the day</u>, parents transfer to school officials the power to act as the guardians of those young wards.
>
> [<u>Ibid.</u> (emphasis added).]

Plaintiffs contend <u>Frugis</u> extends the duty owed by a school beyond the classroom and that school personnel must exercise reasonable care when interviewing, vetting, and making decisions on the hiring of prospective employees. Plaintiffs' reliance on <u>Frugis</u> for this proposition is misplaced.

In <u>Frugis</u>, the Court considered the duty of care in the context of negligent supervision. It established the duty of care for schoolteachers and administrators supervising children entrusted to their care during school hours. <u>Id.</u> at 258.

Here, plaintiffs have not alleged that the school defendants negligently supervised J.P. when the abuse occurred, and it is undisputed that the school defendants were not actually supervising J.P. when the sexual abuse occurred, since the abuse occurred outside the school. <u>See</u> <u>Jerkins</u>, 191 N.J. at 306 (stating that "schools are [not] guarantors of students' safety with respect to all activities during or after dismissal. A school district's responsibility has temporal and

14

physical limits, and its obligation to act reasonably does not diminish the responsibilities that parents or guardians have to their children."). Instead, as alleged by plaintiffs in their complaint, this is a negligent hiring case. Therefore, as the trial court found, Frugis is not the controlling case.

The duty of care and the required elements to prove a negligent hiring claim were established by the Court in Di Cosala v. Kay, 91 N.J. 159, 170-71 (1982) (holding "[a]n employer whose employees are brought into contact with members of the public in the course of their employment is responsible for exercising a duty of reasonable care in the selection or retention of its employees.").

"[T]he tort of negligent hiring has as its constituent elements two fundamental requirements." Id. at 173. "The first involves the knowledge of the employer and foreseeability of harm to third persons." Ibid. Regardless of whether the employee was acting within the scope of employment, "[a]n employer will only be held responsible for the torts of its employees . . . where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." Ibid.

"The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." Id. at 174. "To be found liable for negligent supervision or training, the plaintiff must satisfy what is essentially the same standard, but framed in terms of supervision or training." G.A.-H. v. K.G.G., 238 N.J. 401, 416 (2019).

"[T]he duty owed by [a] negligent employer [is not] limited to situations within the scope of the employment of [its] employees." Di Cosala, 91 N.J. at 174. Rather, "the duty owed is properly to be determined by whether the risk of harm from the dangerous employee to . . . the plaintiff was reasonably foreseeable as a result of the employment." Ibid. "Thus, the issue of duty owed to a plaintiff is a question of foreseeability." Id. at 175.

Our Supreme Court "has recognized a critical distinction between foreseeability necessary to create a legal duty and foreseeability necessary to establish proximate cause." Ibid. See Hill v. Yaskin, 75 N.J. 139, 177 (1977). With respect to the former, the Court has stated that:

> damages for an injury resulting from a negligent act of the defendant may be recovered if a reasonably prudent and careful person should have anticipated, under the same or similar circumstances, that injury to the plaintiff or to those in a like situation would probably result. The most common test of negligence, therefore,

16

is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts.

[Di Cosala, 91 N.J. at 175 (emphasis omitted) (quoting Hill, 75 N.J. at 144).]

We turn then to a consideration of the Di Cosala elements, beginning with knowledge of the employer and foreseeability of the harm to third persons. Plaintiffs do not argue the school defendants had actual knowledge that Miller had propensities that might harm children under his care. Instead, they assert the school defendants breached the reasonable care standard established in Frugis by failing to properly vet Miller. If they had contacted Miller's prior employers, specifically Nature's Classroom, the school defendants would have learned of his "pedophilia."

In finding plaintiffs had not demonstrated a prima facie claim of negligent hiring, the trial court stated:

> [T]he [Di Cosala] analysis begins with an examination of the employer's hiring and whether it/they had reason to know of the employee's unfitness or dangerous attributes.
>
> On this motion record, no such claim can be sustained. Plaintiffs' attempt to paint a picture of Miller's hiring as problematic because of the BOE['s] . . . failure to dive deeper into his credentials; to contact every one of his prior employers; investigate gaps in his employment; and the reason behind his apparent name

17

change does not alter the fact the hiring of Miller, and/or the failure to dive into his prior credentials, although arguably flawed, doesn't establish [a] legal duty for them to have done this. Moreover, on these facts, plaintiffs cannot meet the first part of the test needed to establish a claim of negligent hiring; demonstrating that defendants knew, or had reason to know, of Miller's particular dangerous propensity to commit sexual assault. It is clear that school [b]oards and entities that care for children have an enhanced duty to ensure that those they employ are not only qualified, but safe to be around our children. However, nothing in this record was known to the BOE . . . that serve[s] to establish that [it] knew or had reason to know that Miller would endanger children.

The evidence supports the trial court's conclusions. Not only did plaintiffs not demonstrate the school defendants knew or had reason to know Miller might harm children, but the evidence pointed to the contrary result. All of the reviews and comments from Miller's superiors and colleagues were glowing. In the five years he worked at the school, there was not one complaint or reported incident of any issues with the children.

Plaintiffs also contend the school defendants were negligent in failing to contact Miller's prior employers. However, at the time of Miller's hiring in 2006, there was no legal duty for the school defendants to pursue those contacts.[6] Even

---

[6] Title 18A was amended in June 2018 to require school districts hiring for positions "involv[ing] regular contact with students" contact applicants' former

if the school defendants had contacted Miller's prior employers, they might not have included Nature's Classroom as it was listed as Miller's third most recent employer.

Plaintiffs also failed to establish that the school defendants had a legal duty to go beyond the criminal background check in the hiring process. They did not present this court or the trial court with any authority supporting their argument. See State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977) (stating "parties to an appeal are required to justify their positions [with] specific reference to legal authority"); Miller v. Reis, 189 N.J. Super. 437, 441 (App. Div. 1983) (issue not briefed beyond conclusory statement need not be addressed).

B.

In considering plaintiffs' assertion that the school defendants may be held liable because they violated their internal policies, specifically policies #4230, "Outside Activities," and #3281, "Inappropriate Staff Conduct," we find this argument unpersuasive. Policy #4230 did not prohibit S.A. from hiring Miller as a private babysitter for her children nor did it prohibit Miller from accepting

---

employers that were "schools" or "involved direct contact with children." N.J.S.A. 18A:6-7.7.

the employment. It is less clear whether #3281 prevented Miller from driving J.P. in his private vehicle, under the circumstances present here, where S.A. hired Miller to care for her children, gave him permission to drive J.P. home, and Miller's immediate supervisor approved the arrangement.[7]

Nevertheless, even if the school defendants violated policies #4230 and/or #3281, plaintiffs did not establish that the school defendants breached any duty owed to them. As the trial court reasoned, the BOE's internal policies do not establish the applicable standard of care in the present case. See Labega v. Joshi, __ N.J. Super. __, __ (App. Div. 2022) (slip op. at 26); Cast Art Indus., LLC v. KPMG LLP, 416 N.J. Super. 76, 106 (App. Div. 2010). Rather, as explained above, the applicable standard of care owed to plaintiffs is set forth in Di Cosala. Therefore, any violation of the policies would not have established a prima facie claim of negligent hiring because plaintiffs could not show that the school defendants knew or had reason to know of Miller's dangerous attributes, nor would the alleged violations have allowed the school defendants to reasonably foresee that Miller would sexually abuse J.P. See Di Cosala, 91 N.J. at 173.

---

[7] Policy #3281 appears to apply only to teaching staff, not support staff. The record does not reflect whether this policy was applicable to Miller.

Because plaintiffs cannot show the school defendants knew or had reason to know of Miller's dangerous attributes, they cannot demonstrate defendants could have reasonably foreseen that hiring Miller created a risk of harm to other people. In short, plaintiffs have not established the school defendants breached any duty owed to them. We, therefore, need not reach the issue of proximate cause.

## C.

Plaintiffs raise a new argument on appeal, asserting S.A. can proceed with her own lawsuit to seek recovery based on the loss of J.P.'s past or future services to her. Because the issue was not raised before the trial court, we decline to consider it here. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-0180-20