EAGLE MOTOR LINES, INC. *v.* MITCHELL.

No. 39377　　　　March 16, 1955　　　78 So. 2d 482

*Huff & Williams,* Meridian, for appellant.

*Snow & Covington,* Meridian, for appellee.

Arrington, J.

Mrs. Pearl Mitchell filed her suit in the Circuit Court of Lauderdale County against Eagle Motor Lines, Inc., an Alabama Corporation, doing business in the State, and Joe Burnham, to recover damages for personal injuries. Her declaration, as amended, in effect charged negligence in two respects, namely, (1) that Joe Burnham, as agent and in the scope of his duty and employment for Eagle Motor Lines, negligently drove one of its large trucks into the intersection of Highways 11, 80, and 22nd Avenue in the City of Meridian and negligently collided with the automobile which she was driving, and (2) that Joe Burnham, at the time, was intoxicated, and that Eagle Motor Lines knew, or by the exercise of ordinary or reasonable diligence should have known, that prior to and during his employment, he drank intoxicating liquor to excess.

The answer of Joe Burnham amounted to a general denial of the allegations of the declaration. The answer of Eagle Motor Lines admitted that the truck, which was

involved in the collision, belonged to it; and that Joe Burnham was a regular employee; but it averred that, at the time and on the occasion in question, he was on a mission of his own, and was not in the business of Eagle Motor Lines and was not acting within the scope of his employment. It also denied that it knew, or that in the exercise of reasonable or ordinary care, it should have known, that Joe Burnham drank intoxicating liquor to excess.

The jury returned a verdict for the plaintiff in the sum of $20,000 against both defendants; but only Eagle Motor Lines has appealed.

On the morning of June 21, 1951, Mrs. Mitchell, who lived south of Meridian, was proceeding to town in her Chevrolet automobile. Her grandson and a little negro boy were also in the car. She approached the intersection of Highways 11, 80 and 45, or 22nd Avenue, on the Tom Bailey Drive, which is equipped with signal lights, namely, green to go, and red to stop. The red light was on and she stopped. When she got the green light, she started across. However, before she could get over the intersection, a large truck, coming west on Highway 80, ran through the red light, and collided with her car before she could stop or get out of the way. The truck passed Sylvester Taylor in a dump truck about 100 yards east of the intersection. At that time the brakes were on and the wheels were screeching. It skidded, ran through the red light, and struck the Chevrolet car in the right side, throwing Mrs. Mitchell out upon the pavement.

When Robert L. Birdsong, with the Police Department, arrived shortly afterwards, he opened the truck door, and Joe Burnham, who was under the steering wheel, fell out. Burnham's tongue was thick, he could not hold himself up, and the witness had to lead him to the police car. Birdsong was positive that Burnham was drunk. Skid marks appeared on the pavement for a distance of 87½ yards, from the place where the

brakes were applied to where the truck stopped. Sam Keller, another traffic officer, gave full corroboration as to the distance of the skid marks, that Burnham was drunk, and as to preferring charges against him. Burnham posted a bond in the sum of $10.50, for running a red light, and plead guilty and paid a fine of $50.50 for driving while intoxicated.

Joe Burnham's home was at Hanceville, Alabama, about 35 miles from Birmingham, the home office of Eagle Motor Lines. Miss Ruth Lovelace, who lived at Hanceville, by deposition, testified that she was acquainted with Burnham, and that she knew his general reputation for drinking intoxicating liquor on and prior to June 21, 1951, and that such reputation was that he was a drunkard. Likewise another neighbor, Conrad Howse, testified that it was the general talk that Burnham drank. Another neighbor, Grover Roberts, testified that Burnham had the general reputation of getting under the influence of, and becoming intoxicated from, drinking intoxicating liquor.

It was shown by Ocie Cook, an agent of the company, called as an adverse witness, that Burnham, about 5:30 on the afternoon of June 19, 1951, was dispatched with the truck to deliver a load of freight to Waynesboro, Mississippi, about 175 miles away. The gross weight of the truck, loaded, was 52,100 pounds. He was to drive for ten hours and then sleep, and of course could not return that night. The truck was in his care, and admittedly it was his duty to see that it had gas and oil and was properly serviced. This witness was in full charge of selecting and firing drivers. About 1947, Burnham drove a truck of the company for about a year, and the witness considered him a good driver. He went back to work the latter part of 1950. The witness testified that he had never heard of Burnham's using liquor or driving under its influence. But he knew that Burnham lived at Hanceville and admitted that he had never inquired of Burnham's neighbors, or talked to anyone

at Hanceville about him. He also admitted that the company had a charge account with the Ross Service Station in Meridian.

Dallas Light drove another Eagle truck on the same trip to Waynesboro. He and Burnham did not arrive at their destination until about 1:30 the next morning, and did not complete unloading until 3:30 or 4 o'clock that afternoon. They then returned to Meridian about 7 o'clock in the evening, driving to the Ross Service Station, where Light "gassed up" his truck. Burnham simply parked his. They ate, loitered about town, and finally drove out to the Log Cabin in Burnham's truck. Later they returned to the Ross Service Station, and then, after getting into their separate trucks, they drove to the Blue Top, another tavern, several miles east of Meridian, to eat breakfast. Light then went on to Birmingham. Burnham met up with Claude Johnson at the Blue Top and left his truck there during an hour or so, and went with Johnson and his woman companion to several other taverns. They had several drinks and returned to the Blue Top. Johnson and his companion then started to Meridian, thinking that Burnham was going to Birmingham. However, when they were in about three and one-half miles of Meridian, Burnham passed them in his truck, going west. He and Johnson recognized each other at the time, but neither stopped.

Burnham testified that he and Johnson had drunk about a half pint of liquor but that he was not drunk. When he left the Blue Top and was traveling west toward Meridian, he said that he was going back to the Log Cabin southwest of Meridian, to see Johnson with whom he had been going about for an hour or so. He had made no further engagement with Johnson, knew that he had left in an automobile, and knew when he overtook and passed Johnson. He admitted that he made no effort to stop Johnson at the time. He said that he had some personal business with Johnson, but declined to tell what it was. He said that he was going

45 or 50 miles an hour and that he was caught at the intersection as the green light switched to red, and that although he did everything he could, his truck struck the car. He admitted that he had drunk liquor before and after he began to work for Eagle Motor Lines, but declined to say how often. He did say that he never drank while at work. He admitted that Miss Lovelace, Green Roberts and Conrad Howse should know his reputation. On cross-examination, he was asked if he did not, in the summer of 1952, have a conversation with Attorney Ed Snow and Charlie Mitchell, husband of the appellee, in which he said that he was drunk on the occasion of the collision, and that he did not know just exactly where he was going, but that he reckoned he was going back to the filling station. He admitted a conversation, but denied that he made that statement.

Fred Grimmett, driving a truck which he had leased to Eagle Motor Lines, testified that Burnham had a general reputation for sobriety in the community of Hanceville up to June 21, 1951. Claude Johnson had seen Burnham take a drink on four different occasions in Birmingham.

In rebuttal, Charlie Mitchell testified that Burnham made the statement about which he was questioned and which appears above.

The record is bare of proof that oil or gas was put in the truck at any time on the trip. There was proof that it could not be served with oil or gas at the Blue Top. It was admitted that Eagle had a charge account at the Ross Service Station.

 █ It was admitted that Joe Burnham was a regular driver for Eagle, and that the truck which he was driving and which collided with the Chevrolet belonged to Eagle. From those facts it is presumed that Burnham was then engaged in the furtherance of Eagle's business and in the line of his appointed duties. Barmore v. V. S. & P. Ry. Co., 85 Miss. 426, 38 So. 210; Slaughter v. Holsomback, 166 Miss. 643, 147 So. 318;

Southern Bell Tel. & Tel. Co. v. Quick, 167 Miss. 438, 149 So. 107; Bourgeois v. Miss. School Supply Co., 170 Miss. 310, 155 So. 209; Merchants Co. v. Tracy, 175 Miss. 49, 166 So. 340.

The burden, therefore, was on Eagle to prove that Burnham had abandoned the duties of his employment, and had gone about some purpose of his own, in which Eagle's business was not concerned, and which was not incident to his employment. Barmore v. V. S. & P. Ry. Co., supra; Slaughter v. Holsomback, supra; Southern Bell Tel. & Tel. Co. v. Quick, supra; Bourgeois v. Miss. School Supply Co., supra; Merchants Co. v. Tracy, supra.

 █ Where the testimony leaves this question in doubt, the issue must be submitted to the jury. Barmore v. V. S. & P. Ry. Co., supra; Southern Bell Tel. & Tel. Co. v. Quick, supra; Bourgeois v. Miss. School Supply Co., supra; Lovett Motor Company v. Walley, (Miss.) 64 So. 2d 370.

On the issue as to whether or not Burnham deviated from his duty, his testimony on the stand was unequivocal that, at the time of the collision, he was on his way from the Blue Top to the Log Cabin to see Claude Johnson about a personal matter. But the evidence further showed that he had been with Johnson for several hours; that they separated; and there was no engagement to see him later. He declined to state what the business was. Moreover, he passed Johnson, in a car, on the highway and recognized him at the time, but made no effort to stop and talk to him about such business. Eagle had a charge account with Ross Service Station. When Dallas Light and Joe Burnham drove into Meridian from Waynesboro, they went to the Ross Service Station, where Light had his truck "gassed up." Burnham parked his truck. There was no proof that he had his truck "gassed up" or serviced. Burnham testified that the Blue Top was not a place to service his truck for gas or oil. In other words, after a trip from Birmingham to Waynesboro and thence to Meridian, there was

no proof that Burnham had put oil or gas in his truck, or that he had any therein, to make the trip from Meridian to Birmingham. In explanation of why he was traveling west on Tom Bailey Drive and whence he was bound at the time of the collision, he said, according to Charlie Mitchell, that he was drinking pretty heavy or was drunk, and that he did not remember where he was going, but reckoned that he was going back to the service station.

██ █ In view of the necessity for oil and gas in the operation of the truck, and the absence of proof that the truck had been serviced in these respects, the jury could reasonably infer that he was going to the Ross Service Station to have his truck serviced for the return trip to Birmingham, in which event he was obviously within the scope of his duty. If he was in fact so drunk that he did not remember where he was going, the jury could reasonably infer that he had not deviated from his duty, because, in that event he was, to all intents and purposes, lost. Passing Johnson, whom he recognized, and failing to indicate that a further conference was desired, was a circumstance from which the jury could infer that he did not purpose or intend to talk further to Johnson.

So, whether Burnham had deviated from his duty was, on the conflicting evidence, a question for the jury; and there was a substantial basis for the jury's determination that he had not deviated.

While liability could have been rested, under the facts in this case, solely on the first charge in the declaration, it is necessary to deal with the second charge also, as the jury was fully warranted in finding that Burnham was drunk at the time of the collision.

In Levy v. McMullen, 169 Miss. 659, 152 So. 899, this Court said:

"In Anderson v. Daniel, 136 Miss. 456, 101 So. 498, Herrman v. Maley, 159 Miss. 538, 132 So. 541, and in subsequent cases, this court has become definitely committed to the principle that when the owner of an automo-

bile permits its use by a person known to the owner to be a reckless or incompetent driver, or where by the exercise of reasonable care the owner could or should have so known, the owner is liable for all such injuries as are the natural and probable consequences of the recklessness or incompetency of the said driver while using the automobile so furnished; and in Slaughter v. Holsomback, 166 Miss. 643, 147 So. 318, this court further declared that a drunken driver is an incompetent driver, and that when an owner furnishes an automobile to another whom the owner knew or ought to have known was liable to be drunk while driving, the owner is responsible for an injury which results as a proximate consequence thereof. The broad principle upon which this liability is founded is tersely and accurately stated as follows: 'One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or from facts known to him should know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them.' Slaughter v. Holsomback, supra, 166 Miss. 656, 147 So. 318, 321.''

A good statement in regard to the master's duty in connection with the employment and retention of servants, and pointing out when he may be guilty of negligence in these particulars, is found in 57 C. J. S., Master and Servant, Sec. 559, pages 270-271, as follows:

*''A master may be liable for injuries inflicted on a third person by his servant where he was guilty of negligence in selecting a servant incompetent or otherwise unfit to perform the services* for which he was employed, and this is *especially true where* . . . *the services require the use of instrumentalities which are very dangerous* if not skillfully handled . . . *The master,* in selecting an employee, *must exercise a*

*degree of care commensurate with the nature and danger* of the business in which he is engaged and the nature and grade of service for which the servant is intended . . . ██ *Retaining in employment a servant who is, or should be, known to be incompetent,* habitually negligent, or otherwise unfit, is such negligence on the part of the master as *will render him liable for injuries to third persons* resulting from the acts of the incompetent servant, whether the master's knowledge of the servant's incompetency was actual, or direct, or constructive; *the master is chargeable with knowledge of the incompetency of the servant if by the exercise of due or reasonable care or diligence he could have ascertained such incompetence . . .*" (Emphasis supplied). See also Hamilton Bros. v. Weeks, 155 Miss. 754, 124 So. 798.

In Slaughter v. Holsomback, 166 Miss. 643, 147 So. 318, this Court said: ". . . a person who has the general reputation of being an habitual drunkard is an incompetent driver, and that one who knows, or should know, facts which lead to the belief that one is an habitual drunkard should know that such person is just as unsafe a driver as an imbecile or a baby."

 █ Ocie Cook said that he did not know of Burnham's using liquor or driving while under its influence. But Eagle Motor Lines was a common carrier of freight for hire and was under the duty, in the exercise of reasonable diligence, before entrusting a ponderous truck to be operated in all kinds of traffic on the public highways of this state, to make a reasonable investigation as to the competency of its driver. Burnham did not live in Birmingham. He lived in Hanceville. Men develop their general reputation in the community where they live. Yet, Cook admitted that he talked to no one at Hanceville, and made no inquiry of any of his neighbors. The appellant seeks to justify itself by saying that it did not know and had never heard that Burnham was a drinking man or a drunkard, and yet it never inquired

of the people, who, by every right, should know whether he was or not. If he had a general reputation as a drunkard in the community, reasonable diligence should have disclosed his addiction and the extent thereof. █ Thus the evidence was ample to show that the appellant failed to exercise reasonable diligence in employing and retaining Burnham as a driver.

In Richton Tie and Timber Co. v. Smith, 210 Miss. 148, 48 So. 2d 618, where liability was upheld, Charlie Johnson, the driver of the vehicle, had a general reputation of driving while intoxicated, as well as other traits of incompetency, but it was not contended that the appellant had actual knowledge thereof.

In Lovett Motor Company v. Walley, (Miss.) 64 So. 2d 370, where liability was denied, it was not shown that Palmer, the driver of the car, was a habitual drunkard. Two witnesses testified that his reputation for drinking was bad, and this was held to be insufficient notice that he was a habitual drunkard.

Appellee's two instructions on the merits, setting forth the applicable principles of law on her two claimed grounds of liability, were substantially correct.

 █ Appellant complains of the refusal of its requested instruction to the effect that unless the jury believed that Joe Burnham at the time and place in question, was acting within the scope of his employment in the furtherance of the business of Eagle Motor Lines, then they would return a verdict for it. This instruction ignored the other ground of claimed liability. If it had been given, even though the jury might have believed that there was negligence in the employment and retention of Burnham as an incompetent driver, still they would have been bound to find for the defendant.

 █ Another refused instruction, which is complained about, required the jury to find that Joe Burnham was permitted to use the truck "when they (Eagle) knew or from facts known to them should have known that he was an excessive user of intoxicating liquors

. . ." This instruction was fashioned after the rule in A. L. I., Restatement, Torts, Sec. 390, with which this Court seems to be in agreement. Ordinarily this would be a correct statement on the liability of the supplier of a chattel. But in this case, Burnham was an employee who was charged with the responsibility of operating a large commercial truck over the public highways of the State. The duty of Eagle Motor Lines, therefore, extended to the exercise of reasonable diligence to ascertain that he was a competent driver. If it failed to do this, and if Burnham was in fact incompetent and if the injury resulted from his incompetency, then Eagle Motor Lines would not be absolved from liability therefor, even though Burnham, at the time, had deviated from the business of his employer. So that the true principle here is that unless it knew, or from facts known to it in the exercise of reasonable diligence, it should have known that he was an excessive user of intoxicating liquor, etc.; it would not be liable on that ground. This conclusion is in accord with all of the applicable authorities hereinbefore cited. Appellant was not at liberty to shut its eyes and close its ears and thus be able to say, "we did not know, and no facts were known to us whereby we should have known" that Burnham was an incompetent driver. They were charged with the duty to exercise reasonable diligence to find out whether he was a competent driver. This instruction does not jibe with the legal principle which is applicable under the particular facts of this case. It was not an apt statement here, and was susceptible of misleading the jury. Thus there was no error in refusing it.

 ██ Without detailing the injuries which were sustained by the appellee it is sufficient to say that they were shown to be serious and permanent, and the amount awarded, therefore, is not so large as to warrant this court in reducing the amount of the recovery.

Due consideration has been given to the several assignments, and further response is deemed unnecessary. No reversible error appears in the record, and it follows that the judgment of the trial court should be, and is, affirmed.

Affirmed.

*Roberds, P. J.,* and *Hall, Lee* and *Kyle, JJ.,* concur.