# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CT-00667-SCT

*BONNIE RICHMOND*

*v.*

*MISSISSIPPI DEPARTMENT OF HUMAN SERVICES*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/16/96 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SUSAN M. BREWER |
| ATTORNEYS FOR APPELLEE: | GLORIA J. GREEN |
| | EDUARDO V. MARTINEZ |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND REMANDED - 7/29/1999 |
| MOTION FOR REHEARING FILED: | 08/13/99; denied 10/07/99 |
| MANDATE ISSUED: | 10/14/99 |

**EN BANC.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Bonnie Richmond was dismissed from her employment as a social worker with the Department of Human Services (DHS) for a comment made during a meeting with two high level officials of the department. Richmond appealed her dismissal to the Mississippi Employee Appeals Board (EAB) where a hearing officer reinstated her to her previous position with back pay. The EAB sitting en banc, affirmed the decision of the hearing officer, and DHS filed for certiorari in the Circuit Court of Hinds County, Mississippi. The circuit court found the decision of the board was arbitrary and capricious and reversed the decision of the EAB. Bonnie Richmond appealed, and the case was assigned to the Court of Appeals. The Court of Appeals found that the decision of the EAB was not arbitrary and capricious and reinstated the decision of the board. DHS filed a timely Petition for Writ of Certiorari, which was granted. Finding error, we reverse and remand.

### FACTS

¶2. On May 23, 1994, Bonnie Richmond and her co-worker, Renee Elmore, met with Joyce Johnson, the Director of DHS' Division of Family and Children Services, and Jerald Everett, a personnel officer for DHS. During the conference, Bonnie Richmond indicated that she would like to discuss other office

concerns with Ms. Johnson which were not on the agenda. Johnson had another previously scheduled matter to attend to, but informed Richmond and Elmore that she would speak with them later in the day.

¶3. Later that day, when Bonnie Richmond and Elmore were speaking to Johnson and Everett regarding their concerns with their local office in DeSoto County, Johnson inquired why Varrie Richmond,[1] who was assigned to DHS' Tate County office, was traveling to DHS' office in DeSoto County to review cases. Bonnie Richmond replied, "all I can say about Varrie, she's a good ole nigger." The meeting ended shortly thereafter, and Bonnie Richmond and Renee Elmore left to return to the DeSoto County office, at which point Johnson and Everett discussed Richmond's comment. Johnson and Everett then pulled out a dictionary to look up the meaning of the word. Johnson told Everett to think about the situation since he was in personnel and let her know what came about.

¶4. The next morning, Tuesday May 24, 1994, Varrie Richmond went to the DeSoto County DHS office to review cases, as she had done in the past. She was informed during a conversation with Bonnie Richmond and Renee Elmore that there might be a problem with her coming from the Tate County office to review cases in the DeSoto County office. At some point during the conversation, Elmore said something to the effect of, "guess what Bonnie said about you," or "you will never believe what Bonnie said to Ms. Johnson about you." There is a dispute in the testimony as to who then told Varrie Richmond about Bonnie Richmond's comment to Johnson. Elmore testified that Bonnie Richmond told Varrie Richmond the contents of the statement, while Varrie Richmond and Bonnie Richmond testified that Elmore actually told her the contents of the statement. Varrie Richmond informed Bonnie Richmond that she thought that the word was derogatory and that did not appreciate being referred to in that manner. Bonnie Richmond apologized to Varrie Richmond and told her that she did not mean it in a derogatory manner.

¶5. The next day, calls began coming into Ms. Johnson's office inquiring as to whether she approved of Bonnie Richmond's comment. Johnson testified that she assured the callers that the comments were not condoned. She further testified that approximately sixty percent of the four to five thousand workers in her agency are of African American descent, and that it was felt by her and others that the perception or appearance that the agency condoned the comment could cause, "a very severe, very critical problem."

¶6. The agency made the decision to terminate Bonnie Richmond from her employment, and a termination notice was given to Bonnie Richmond. The termination letter charged Bonnie Richmond with a Group III Offense, Number 11 which provides:

> Acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue to employee in the assigned position could constitute negligence in regard to the agency's duties to the public or other state employees.

The termination letter also charged her with a Group III Offense, Number 16 which is a "[w]illful violation of State Personnel Board policies, rules and regulations. In support of the charges, the pre-termination letter to Bonnie Richmond alleged:

> On May 23, 1994, while in a conference with Joyce Johnson, Division Director of Family and Children's Services and Jerald Everett of the Division of Human Resources, you referred to one of our black employees as a "good ole nigger." Further on May 24, 1994, upon return to DeSoto County Office, you approached this black employee and told her that you had been in a meeting in Mrs. Joyce Johnson's office and had told them that she was a "good ole nigger." Your conduct in referring

to a minority employee of the Mississippi Department of Human Services (MDHS) as a "good ole nigger" was offensive. It further has created a hostile, harassing and offensive environment for the subject employees and other MDHS employees and administrators. Your conduct in returning to the DeSoto Office and repeating the phrase "a good ole nigger" as though it was acceptable MDHS behavior has created a distraction within the DeSoto Office and surrounding areas, causing employees to question whether the Department condones the use of racial slurs and indignities and, thereby, calling into question the integrity of the Department. To allow you to continue in this position would discredit the agency, impair the agency's ability to provide services, violate the agency's responsibility to the public to administer non-discriminatory services, violate the agency [sic] duty to administer [a] working environment free of discriminatory practices and procedures and subject the Department to potential liability for unlawful discrimination.

¶7. Bonnie Richmond appealed the matter, and a hearing was held before Hearing Officer Falton O. Mason, Jr. on November 16, 1994. At the hearing, in addition to the facts previously set forth, Varrie Richmond testified that she found the comment offensive and that it "denotes everything negative in regards to an individual." She further testified, "it was not like there was any real big problem associated with the incident. I guess it could have been a real big problem as far as I was concerned, but it's not how I deal with things." She went on to say, "I tend to withdraw from things of that nature and I really don't take issue with them, and I have a hard time being overtly ugly to anybody even when I have been -- when my feelings have been hurt."

¶8. Bonnie Richmond testified in her own behalf regarding the incident. She admitted to making the statement, but denied that it was racially motivated. She stated, "[t]hat phrase was meant not to have to do with a person's color, but it was kind of an office joke referring to Varrie Richmond's inability to assert herself." She stated, "I would never say anything derogatory that I thought someone would take in that manner. You know, I thought that we had used that terminology previously and Varrie didn't seem to have a problem with it, nor anyone else." Bonnie Richmond further testified that she had been referred to as a "honkie" and a "redneck", but that she did not take that personally. Finally, as to the setting in which the comment was made, Bonnie Richmond testified, "[t]hat setting was very I felt informal and Ms. Johnson was very good at making us feel welcomed and relaxed, and, yes, I was very open. If she had not, I probably would have been more on guard and not said that."

¶9. The hearing officer reinstated Richmond with backpay, and in his order equated the comment to calling a person a teacher's pet. DHS appealed to the full Mississippi Employee Appeals Board, which affirmed the decision of the Hearing Officer. DHS then filed a petition for writ of certiorari in the Circuit Court of the First Judicial District of Hinds County, Mississippi. The circuit court, Hon. James E. Graves, Jr. presiding, reversed the decision of the EAB-finding the decision to be arbitrary and capricious and not supported by substantial evidence.

¶10. Bonnie Richmond appealed, and the case was assigned to the Court of Appeals which, in an unpublished 5 - 4 decision, reversed the circuit court and reinstated the decision of the Mississippi Employee Appeals Board. The majority held:

In this case, the EAB decided that this one use of a racial epithet, when viewed in the context in which it was said, did not constitute sufficient basis to terminate an employee whose service, over a number of years, was shown to have been satisfactory in all other respects. We conclude that there was

evidence in the record to support this conclusion. The authority for judicial intervention does not exist in this case. Therefore when the circuit court proceeded to do so, it erred and that action must be set aside.

*Richmond v. Mississippi Dep't of Human Servs.*, No. 96-CC-00667-COA, slip op. at 10-11(Miss. Ct. App. Aug. 4, 1998). A Motion for Rehearing was filed by DHS and denied by the Court of Appeals. DHS subsequently filed a Petition for Writ of Certiorari, which was granted by this Court.

**LAW**

¶11. Miss. Code Ann. § 25-9-131(1) (1991) provides in relevant part:

The employee appeals board may modify the action of the department, agency or institution but may not increase the severity of such action on the employee. Such appointing authority shall promptly comply with the order issued as a result of the appeal to the employee appeals board.

¶12. In *Johnson v. Mississippi Dep't of Corrections*, 682 So. 2d 367 (Miss. 1996), we set forth the Employee Appeal Board's standard of review regarding an agency's personnel decision.

Rule 20(b) mandates that the EAB shall not alter the action taken by the agency, if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines. That is exactly what happened here. MDOC acted within the rules under which termination was allowed. There is no finding to the contrary. Johnson, having the burden of proof, failed to establish that good cause did not exist for her termination.

*Johnson* at 370-371.

¶13. In *Holly v. Mississippi Dep't of Corrections*, 722 So. 2d 632 (Miss. 1998), we spoke further on the standard of review.

Section 25-9-127, governing appeals to the EAB, requires the appealing party "to furnish evidence that the reasons stated in the notice of dismissal or action adversely affecting his compensation or employment status are not true or are not sufficient grounds for the action taken." Miss. Code Ann. § 25-9-127(1) (1994).

No employee of any state agency may be dismissed unless there is good cause and after written notice and hearing. Miss. Code Ann. § 25-9-127 (Supp.1990). Employees affected by adverse decisions may appeal to the Employee Appeals Board (EAB) for de novo hearing, then to circuit court for judicial review on the record, and finally to this Court. Miss. Code Ann. §§ 25-9-131 and 25-9-132 (Supp.1990). Review by the circuit court is limited to determinations of whether the EAB's actions are supported by substantial evidence, are arbitrary or capricious, or are in violation of some statutory or constitutional right of the employee. Miss. Code Ann. § 25-9-131 (Supp.1990). *Hood v. Miss. Dep't of Wildlife Conservation*, 571 So.2d 263, 267 (Miss. 1990).

*Holly* at 636.

¶14. Finally, regarding the burden of proof in such cases, we have stated:

The statute and administrative regulations clearly place the burden of persuasion on the aggrieved

employee to demonstrate that the reasons given are not true. Rule 17, Administrative Rules of the Mississippi Employee Appeals Board; Rules Miss.Code Ann. § 25-9-127 (1972). . . . .This is not mere semantics. Under our scheme, in a nutshell, ties go to the appointing authority. That is, unless the employee carries the burden of persuasion that the alleged conduct did not occur, the employee has no right to have the employment decision overturned. *Mississippi Employment Security Commission v. Collins*, 629 So.2d 576, 580 (Miss.1993); Miss.Code Ann.§ 25-9-127.

*Mississippi Dep't of Corrections v. McClee*, 677 So.2d 732, 735 (Miss. 1996).

¶15. In the present case, Bonnie Richmond was an employee of over five years with an otherwise acceptable employment record. The case in question arose out of a single use of a racial slur. Varrie Richmond, the person in which the word was used in reference to, seemingly accepted the apology offered by Bonnie Richmond and did not feel it necessary to report the incident to her superiors. We find that Bonnie Richmond's use of the slur on a single occasion does not rise to the level of creating a hostile environment. *See Vaughn v. Pool Offshore Co.*, 683 F.2d 922 (5th Cir. 1982). Therefore, the unique circumstances of this case do not warrant imposition of the ultimate penalty of dismissal of Bonnie Richmond from her employment with the DHS.

¶16. However, the Hearing Officer made no finding that DHS did not act in accordance with the published rules of the State Personnel Board or the decision was not allowed under the guidelines. In addition, the EAB erred by not making sufficient findings on the record as to why there should be no penalty. This is contrary to the holdings of the Court in *Johnson, McClee*, and *Holly*, discussed previously herein. We therefore remand the present case to the EAB in order for the board to impose an appropriate penalty less than dismissal, or to make detailed findings as to why no penalty should be imposed.

¶17. By our decision today, we do not condone the use of slurs--racial, ethnic, or otherwise--in the workplace. We are not insensitive to the fact that the use of such words can penetrate to the deepest realms of one's emotions. Terms such as "nigger," "honkie," "redneck," and the like are unprofessional, inappropriate, and uncalled for in the workplace and should not be used either directly or indirectly. We therefore limit our holding to the unique set of circumstances in this particular case, i.e., a first offense, an otherwise good work performance record, and an apology by the offending employee. Given other circumstances, we might very well find that the single use of a racial slur warrants dismissal of an employee from his or her employment. However, in this case, we find that the harsh penalty of dismissal of Bonnie Richmond from her employment is not warranted under the circumstances.

## CONCLUSION

¶18. Under the particular circumstances of this case, Bonnie Richmond's use of a racial slur on a single occasion does not rise to level of creating a hostile work environment, and therefore does not warrant dismissal of her from employment with DHS. However, we remand this matter back to the Employee Appeals Board for the imposition of a lesser penalty, or to make detailed findings on the record why no penalty should be imposed. Finally, we limit our holding to the unique circumstances of this particular case.

**¶19. REVERSED AND REMANDED.**

**PRATHER, C.J., MILLS AND WALLER, JJ., CONCUR. BANKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY**

**SULLIVAN, P.J., AND SMITH, J. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J. McRAE AND COBB, JJ., NOT PARTICIPATING.**

### BANKS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶20. I agree that the Court of Appeals erred in reversing the circuit court's ruling that the board's decision to reinstate Bonnie Richmond was arbitrary and capricious. However, I am of the opinion that this matter should be reversed and rendered, as opposed to being remanded to the Employee Appeals Board.

¶21. In *Johnson v. Mississippi Dep't of Corrections*, 682 So. 2d 367 (Miss. 1996) the Court set forth the Employee Appeal Board's standard of review regarding an agency's personnel decision.

> Rule 20(b) mandates that the EAB shall not alter the action taken by the agency, if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines. That is exactly what happened here. MDOC acted within the rules under which termination was allowed. There is no finding to the contrary. Johnson, having the burden of proof, failed to establish that good cause did not exist for her termination.

Johnson at 370 -71.

¶22. Regarding the burden of proof in such cases, the Court has stated:

> The statute and administrative regulations clearly place the burden of persuasion on the aggrieved employee to demonstrate that the reasons given are not true. Rule 17, Administrative Rules of the Mississippi Employee Appeals Board; Rules Miss. Code Ann. § 25-9-127 (1972). . . . This is not mere semantics. Under our scheme, in a nutshell, ties go to the appointing authority. That is, unless the employee carries the burden of persuasion that the alleged conduct did not occur, the employee has no right to have the employment decision overturned. *Mississippi Employment Security Commission v. Collins*, 629 So. 2d 576, 580 (Miss. 1993); Miss. Code Ann. § 25-9-127.

*Mississippi Dep't of Corrections v. McClee*, 677 So. 2d 732, 735 (Miss. 1996).

¶23. In *McClee*, the Court reversed and remanded the case back to the Employee Appeals Board because the burden of proof was improperly allocated. In so doing the Court stated:

> To be sure, there was evidence that the phone did not work and the witnesses did express some slight equivocation on whether McClee was in fact asleep. That is to say only that upon a correct allocation of the burden of proof, the decision of the EAB could, perhaps, pass muster.

> What the hearing officer said was that he was not convinced that McClee was asleep. That is not the issue. The hearing officer must be convinced that McClee was not asleep in order to overturn the action of the appointing authority. The hearing officer went on to uphold the discharge on grounds not specifically asserted in the charge. The EAB accepted the hearing officer's findings and modified the punishment. Neither the hearing officer nor the EAB is shown to have properly allocated the burden

of proof.

We are therefore compelled to reverse the order of the EAB and remand the matter to it for a decision based on the proper allocation of the burden of proof.

*Id.* at 735-736.

¶24. In the present case, the Court of Appeals found:

The primary thrust of DHS's argument in favor of termination, supported in large part by Johnson's testimony, appears to be that Richmond's termination was necessary as a means of forcefully demonstrating that high-level DHS officials did not, in fact, condone such behavior. . . . If we concede, for sake of argument only, that Richmond's right to continued employment may properly be made to hinge on the collective reaction of other DHS employees to her conduct without regard to whether the reaction was or was not warranted on the facts, **we are still faced with the proposition that the actual disruptive effect of Richmond's remark was a matter that was subject to proof.** The mere fact that such a remark *could* cause substantial problems within an agency does not necessarily translate into the proposition *did*, in fact, cause a disruption. The only evidence in the record on this point is Joyce Johnson's testimony that the state office was receiving numerous calls from county workers all over the state expressing distress with the agency's leadership over the matter. However, on cross-examination, Johnson was asked to give any concrete proof of any such calls. She was unable to do so, saying only that should would "have to go back and check my phone log."**The total absence from the record of any credible proof that Richmond's remark was causing wide-spread consternation among DHS employees must be seen as damaging to DHS' position that Richmond's continued employment was an act of negligence.** (Court of Appeals Opinion at p. 8) (emphasis added) (italics in original).

¶25. It appears that the Court of Appeals and the Employee Appeals Board improperly applied the burden of proof in this case by requiring DHS to prove that Bonnie Richmond's remark caused a disruptive effect. Johnson's undisputed testimony was that she had received telephone calls from other employees concerning the use of the word "nigger" and whether the agency condoned the use of such terms. Bonnie Richmond put on no evidence to the contrary; and therefore, she did not meet her burden of proof. In addition, the hearing officer made no finding that DHS did not act in accordance with the published rules of the State Personnel Board or the decision was not allowed under the guidelines.

¶26. Furthermore, it is clear that DHS had an interest in terminating Bonnie Richmond because not to have taken some sort of action regarding the comment made by her, could possibly have subjected the agency to a claim of a racially hostile environment claim under federal law, and therefore retaining Bonnie Richmond could constitute negligence.

¶27. As previously stated, one of the reasons assigned for terminating Bonnie Richmond was the commission of a Group III Offense, Number 11 which provides:

Acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue to employee in the assigned position could constitute negligence in regard

to the agency's duties to the public or other state employees.

¶28. In *Johnson,* the Court spoke regarding this type of offense.

There are currently no cases that address the right of a state agency's right to dismiss a person when it appears that retention would be negligent. However, this situation is analogous to those where employers have been held liable to third parties for negligently retaining the employee. In *Eagle Motor Lines v. Mitchell*, 223 Miss. 398, 78 So. 2d 482 (1955), this Court stated:

Retaining in employment a servant who is, or should be, known to be incompetent, habitually negligent, or otherwise unfit, is such negligence on the part of the master as will render him liable for injuries to third persons resulting from the acts of the incompetent servant, whether the master's knowledge of the servant's incompetency was actual, or direct, or constructive; the master is chargeable with knowledge of the competency of the servant if by the exercise of due or reasonable care or diligence he could have ascertained such incompetence.

*Mitchell*, 223 Miss. at 412, 78 So. 2d 482.

While there was no evidence that Johnson was incompetent or habitually negligent, abundance of credible evidence exists suggesting that Johnson is "otherwise unfit," due to her apparent propensity to smuggle packages to criminals. We must agree with the circuit judge and his analysis of the situation. Johnson is "otherwise unfit" to work for MDOC.

*Johnson* at 370.

Title VII makes it unlawful "for an employer . . . to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions or privileges of employment" has been interpreted by the courts to provide a cause of action to person who works in a discriminatorily hostile environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

*Grant v. UOP, Inc.*, 972 F. Supp. 1042, 1046 (W.D. La. 1996)(footnote omitted), *aff'd mem.*, 122 F.3d 1066 (5th Cir. 1997).

When a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor. Direct evidence is evidence which, if believed, proves the fact without inference or presumption. We conclude that Brown's evidence passes muster.

*Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (footnotes omitted).

¶29. The court in *Brown*, also stated:

Pippen's routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions. Pippen's use of the racial epithet was not, as EMEPA

suggests, an innocent habit. Unlike certain age-related comments which we have found too vague to constitute evidence of discrimination, the term "nigger" is a universally recognized opprobrium, stigmatizing African-Americans because of their race. That Pippen usually was circumspect in using the term in the presence of African-Americans underscores that he knew it was insulting. Nonetheless, he persisted in demeaning African-Americans by using it among whites. This is racism.

*Brown* at 861 (footnote omitted).

¶30. The court found the employer liable to Brown, and in so doing it stated:

EMEPA has not proven its contention that Murray was not influenced by racial factors. Louvenia Ford testified without contradiction that Murray minimized her complaint about Pippen's use of racial slurs. Although he ostensibly reprimanded Pippen, Murray apparently never considered that Pippen's blatantly racist attitudes might explain his criticism of Brown and might undermine the objectivity of his advice with respect to Brown's position with the company.

Also informing our judgment is Brown's circumstantial evidence of discrimination. In 1982 the company received an anonymous letter complaining of mistreatment of black customers by Clarence Nance, a white serviceman. That letter was placed in Nance's personnel file but the only discipline Nance received was a verbal warning from his immediate supervisor. In 1990 another black customer complained. This time Nance was warned that he would be transferred if there was another complaint but, unlike Brown, he was not moved to a different service territory nor was any other disciplinary action imposed.

*Brown* at 862-63.

¶31. An employer must take prompt remedial action "reasonably calculated" to end the harassment in question. *Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 (5th Cir. 1994) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987). The United States Supreme Court has held that an abusive work environment need not seriously affect the employee's psychological well-being in order to be actionable. *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 22 (1993).

¶32. As previously stated, Varrie Richmond testified that this was not the first instance that Bonnie Richmond had used the term "nigger" in reference to her. While the majority notes that she did not report the incident to her supervisor, she testified that she was upset at the time and still upset at the hearing. Bonnie Richmond and Shirley Hubbard both testified that they and other employees in that particular office joked among themselves about the differences between black and white people or the economic status between people. While the alleged joking in the DeSoto County office regarding the differences between black and white people may not in and of itself be enough to constitute a racially hostile environment, *see generally Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924-25 (5th Cir. 1982), when coupled with the racial slur or slurs uttered by Bonnie Richmond, such conduct may have been enough to do so.

¶33. DHS followed its rules and those of the Personnel Board. The material facts are not in dispute. I would reverse and render the judgment of the Court of Appeals and reinstate the judgment of the Circuit Court.

**SULLIVAN, P.J., AND SMITH, J., JOIN THIS OPINION IN PART.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶34. The majority opines that termination of Bonnie Richmond's employment is too harsh of a penalty in these limited circumstances. The majority would reverse and remand, but would require that the EAB lessen the penalty imposed on Richmond. The majority states that the record is insufficient due to the fact that the Hearing Officer made no findings that DHS failed to act in accordance with its published rules. I agree that the record is insufficient. However, if the record was insufficient then, it remains insufficient now. This Court is in no better position to mandate to DHS what is the proper discipline to be imposed upon Richmond than is the EAB. Based on the evidence before the EAB, DHS acted according to its policy and imposed a punishment that was authorized under its guidelines. Besides, the Court of Appeals and the EAB improperly applied the burden of proof upon DHS requiring the agency to prove that Richmond's remark caused disruption in the agency. Accordingly, I respectfully concur in part and dissent in part to the majority.

¶35. The majority relies upon *Johnson v. Mississippi Dep't of Corrections*, 682 So.2d 367 (Miss. 1996). However, *Johnson* does not support the majority opinion. In that case, this Court set forth the standard of review regarding an agency's personnel decisions. The *Johnson* court stated that the EAB "shall not alter the action taken by the agency, if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines." *Id.* at 371. *Johnson* is more appropriately supportive of this dissent. Based on this Court's ruling in *Johnson*, the EAB should not have altered DHS's imposed penalty due to the fact that DHS took action that was within its guidelines. Again, the majority tells the EAB that it must lessen the penalty. However, even if the EAB changes the penalty imposed, that does not adhere to *Johnson*. The penalty should not be changed, because there should have been no alteration by the EAB in the first place.

¶36. Secondly, the majority concludes that "Bonnie Richmond's use of the slur on a single occasion does not rise to the level of creating a hostile environment." Yet, the record reveals that within only one day of the incident, DHS received telephone calls from DHS employees throughout the state who expressed concerns about Richmond's remarks. The racial slur simply supplied the vehicle whereby the courts are now involved.

¶37. The real issue here is basically, the majority is merely substituting its judgment for that of the agency. This particular issue has been specifically addressed in the case of *Arnold Line Water Ass'n, Inc. v. Miss. Public Service Comm'n*, 1999 WL 161337 (Miss. Mar. 25, 1999). In *Arnold*, we held in pertinent part that, "a rebuttable presumption exists in favor of agency decisions, **and an appellate court may not substitute its judgment for that of an agency**." *Id*. at *3 (emphasis added). Therefore, adhering to *Arnold*, this Court has no authority to substitute its own judgment for that of DHS.

¶38. In conclusion, I disagree that this Court has any authority to alter the decision of EAB based on our caselaw, by substituting what the majority believes is the only appropriate penalty. Applying *Johnson*, the EAB had no authority to alter DHS's penalty in the first place. Again, the EAB "shall not alter the action taken by the agency, if the agency has acted in accordance with the published rule and if the personnel action taken by the agency is allowed under the guidelines." In the same way, even if the EAB's alteration was justified, this Court would not have the authority to substitute our judgment for theirs. *Arnold Line Water Ass'n, Inc. v. Mississppi Public Service Comm'n*, 1999 WL 161337, at *3 (Miss. Mar. 25, 1999).

¶39. I respectfully concur in part and dissent in part and I would reverse and render.

**BANKS, J., JOINS THIS OPINION.**

1. Bonnie Richmond and Varrie Richmond are not related.