831 So.2d 1190 (2002)
MISSISSIPPI DEPARTMENT OF CORRECTIONS, Appellant,
v.
Alvin HARRIS, Appellee.
No. 2001-CC-00423-COA.
Court of Appeals of Mississippi.
December 3, 2002.
*1191 Office Of The Attorney General by Joseph A. Goff; Jane L. Mapp, Attorneys for Appellant.
Johnnie E. Walls, Greenville, Attorney for Appellee.
Before SOUTHWICK, P.J., THOMAS and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. Security guard Alvin Harris was terminated by the Mississippi Department of Corrections following an investigation of an altercation between inmates and guards. Harris appealed to the Employee Appeals Board, which reinstated Harris. The Hinds County Circuit Court affirmed. Here, the Department of Corrections argues that the Appeals Board's decision was arbitrary and capricious, and did not conform to evidentiary burdens. We agree. We therefore reverse and reinstate the Department's termination of Harris.

STATEMENT OF FACTS
¶ 2. On June 24, 1997, a prisoner disturbance erupted at C-Building of the Central Mississippi Correctional Facility in Rankin County. As many as fifty guards responded. After the uprising was over, a number of inmates then received significant injuries that required treatment at the University of Mississippi Medical Center. As a result, an investigation into prisoner abuse was undertaken. Among those implicated was Lieutenant Alvin Harris.
¶ 3. On December 22, 1997, a hearing officer for the Department issued his findings to Superintendent Jack Donnelly. The following day, Harris was terminated. These three offenses identified in a State Personnel Board rule allegedly had occurred:
Group II offense # 1: Insubordination, including, but not limited to, resisting management directives through actions and/or verbal exchange, and/or failure or refusal to follow supervisor's instruction, perform assigned work, or otherwise comply with applicable established written policy
Group III offense # 4: Falsification of records, such as, but not limited to, vouchers, reports, time records, leave records, employment applications or other official state documents
Group III offense # 6: Acts of physical violence or fighting
S.P.B. Rule 9.10 (Rev.1999). Under Personnel Board rules, Group II offenses may result in a reprimand or suspension from work for up to a week, and more severe penalties if multiple offenses occur within a year's time. The Group III offenses are the most serious, and may result in penalties that include dismissal from employment. Id.
¶ 4. Harris exercised his right to appeal the termination to the Employee Appeals Board. In June 1998, the appeal was presented to a hearing officer at the Board. Several witnesses were called. In the hearing officer's opinion, the Department *1192 had acted arbitrarily and capriciously in terminating Harris. Harris's reinstatement was ordered. The Department asked that the Appeals Board review the decision. In May 1999, the Board affirmed the hearing officer's order. Further appeal was taken to the Hinds County Circuit Court, and it affirmed. Our review is now requested.

DISCUSSION

1. Review responsibility, facts and law
¶ 5. The circuit court as the first-level appeals court affirmed the decision of the Employee Appeals Board. Even so, this Court again looks at the same record that was made at the agency whose decision is the subject of this appeal, and applies the same review standard to it regardless of whether the circuit court affirmed or reversed that decision.
¶ 6. We are to affirm an administrative agency if there was substantial evidence to support its decision, and if its actions were not arbitrary or capricious. In the rare circumstance in which an issue is made that the action was beyond the agency's power or violated a participant's constitutional rights, we examine that as well. Mississippi Com'n on Environmental Quality v. Chickasaw County, 621 So.2d 1211, 1215 (Miss.1993). In our review, we do not act as an initial fact-finder. We determine whether the agency could properly have evaluated the contested evidence in a manner that supports the agency decision. Mississippi Public Service Com'n v. Merchants Truck Line, Inc., 598 So.2d 778, 782 (Miss.1992).
¶ 7. An agency's interpretations of statutes that it uniquely is to enforce or apply are entitled to deference. Unless the agency's interpretation overrides a plain meaning that must be given to such a statute or is otherwise unreasonable, a court should accept the interpretation. His Way Homes, Inc. v. Miss. Gaming Com'n, 733 So.2d 764, 767 (Miss.1999).
¶ 8. What makes these normal rules somewhat more difficult in application is that two state agencies are involved in this case. One is the agency that had employed Harris and decided to do so no longer, and the other is the agency to which Harris appealed. Which agency's decision is presumptively correct is a matter that needs addressing.
¶ 9. When an agency has taken disciplinary action against an employee, that person is entitled to review by the Employee Appeals Board under this statute:
Any employee in the state service may appeal his dismissal or other action adversely affecting his employment status to the employee appeals board created herein. The proceedings before the employee appeals board shall be de novo, and the employee shall be afforded all applicable safeguards of procedural due process.... The employee appeals board may modify the action of the department, agency or institution but may not increase the severity of such action on the employee....
Miss.Code Ann. § 25-9-131 (Rev.1999). The statute permits the Appeals Board to modify the action, i.e., the discipline, though it may not increase its severity. A Personnel Board rule, though, restricts this discretion as we discuss momentarily.
¶ 10. The findings of the employing agency are entitled to a presumption of correctness.
Regarding the burden of proof in such cases, we have stated: The statute and administrative regulations clearly place the burden of persuasion on the aggrieved employee to demonstrate that the reasons given are not true.... This is not mere semantics. Under our *1193 scheme, in a nutshell, ties go to the appointing authority. That is, unless the employee carries the burden of persuasion that the alleged conduct did not occur, the employee has no right to have the employment decision overturned.
Richmond v. Miss. Dept. of Human Services, 745 So.2d 254, 258 (Miss.1999). This interpretation approves a Personnel Board rule that at the Appeals Board, the employee "shall have the burden of proving that the action taken against the employee is arbitrary, capricious, against the overwhelming weight of the evidence and merits the relief requested." S.P.B. Rule 10.40.19(B) (Rev.1999).
¶ 11. Also important for our purposes is this rule:
The Employee Appeals Board may modify an action of a responding agency but may not increase the severity of such action on the appealing party. If the responding agency has acted in accordance with the published policies, rules and regulations of the State Personnel Board, and if the personnel action taken by the responding agency is allowed under said policies, rules and regulations, the Employee Appeals Board shall not alter the action, including but not limited to the compensation paid to the employee, taken by the agency.
S.P.B. Rule 10.40.22(B) (Rev.1999).
¶ 12. The Supreme Court has found that these were valid rules under the Board's authority to implement its governing statute. Johnson v. Miss. Dept. of Corrections, 682 So.2d 367, 369-71 (Miss. 1996). Therefore it was Harris who at the Appeals Board had the burden of persuading that his termination should be set aside. If there was evidence to support the findings that at least one Group III offense occurred, an offense which permits an agency to terminate its employee, then the termination must be upheld since the Department "acted in accordance with the published policies, rules and regulations of the State Personnel Board, and ... the personnel action taken by the responding agency is allowed under said policies, rules and regulations...."
¶ 13. It might be said that an appellate court's usual review of decisions requires bifocal lenses. The lenses for distance viewing are for the fact-finding, as we do not focus intently and anew on the credibility and volume of evidence choices. The close-up magnification is for decisions regarding the law, as an appellate court is not limited by the trial court in reviewing legal issues. In the present case, because of the respective roles of two different agencies, trifocals may be required.

2. Evidence before Appeals Board
¶ 14. The Appeals Board's final decision, affirming its hearing officer's conclusions, was that the Department of Corrections had acted arbitrarily and capriciously in terminating Harris. He was ordered to be reinstated. The basis was alleged shortcomings in the evidence to prove that Harris had participated in the beatings of any inmates.
¶ 15. The Appeals Board hearing officer took evidence from a variety of witnesses. His decision was not based on the record made at the Department of Corrections but instead was a new evidentiary presentation. Nonetheless, it is for the Appeals Board and a hearing officer who takes the evidence to determine if the employee has carried his burden of persuasion that the agency's decision was incorrect.
¶ 16. There was evidence that on June 24, 1997, an altercation broke out between Officer James Vance and an inmate named Lavelle Hines. As the two struggled, Officer Lynda Jordan sounded an alert that an *1194 officer was down. Jordan testified that during the scuffle, a second inmate, Isaac Bogen, jammed his hand into a door to keep it from closing. Officers began swarming into the building where this was occurring. Among the responding officers were Lieutenants Kevin Jackson and Alvin Harris, who were said to be known at the correctional facility as "Thunderbolt and Lightning." Lieutenant Jackson testified to the significance of the nicknames, though he also disclaimed any truth to the attached meaning:
That meant to offenders and to whoever heard Thunder and Lightning, meant that when you saw Thunder and Lightning it was time to run. It was time business was about to be taken care of. That's in prison terms. Whenever you heard those names, then quote unquote "Somebody was fixing to get dealt with."
¶ 17. Lieutenant Thorp Rayfield, another responding officer, testified that when he arrived on the scene, inmate Hines was in front of the control room and was not in a required zone. Rayfield escorted him away and turned him over to another corrections officer. At this point, Bogen, the second inmate, ran down a hallway towards the unit administrator's office. Rayfield and a contingent of officers pursued Bogen and restrained him. As they returned down the hallway, Rayfield noticed in his peripheral vision some movement from the "ice room." He turned and saw Lieutenant Harris exiting the room. Harris would later deny being in that room. Harris noted that Rayfield earlier had not been able to name him, but merely described a bald, black man coming from the room. Rayfield explained that when this incident occurred he was a relatively new officer. At that time he had not known Harris's name. He was certain that the person he saw was Harris.
¶ 18. Hearsay evidence was admitted, including the findings of the Department's internal investigator Milton Loller. Loller testified that both Lieutenant Rayfield and Officer Vance witnessed Harris standing over a handcuffed Hines, whose head was in the drain in the ice room.
¶ 19. Harris denied most of this. He said that he was never in the ice room nor did he assault Hines. "If they wanted me to be the one in the utility room, it wouldn't be a problem for them to decide it was going to be me or make it me." Harris testified that he was not involved in securing inmate Bogen. Upon arriving in the building where the fracas was occurring, Harris attempted to send inmates back to their cells. A third inmate, Albert Moore, moved too slowly and verbally abused Harris. Harris ordered Moore to be placed with Hines and Bogen. Rayfield, having secured Bogen in one area of the building, entered the section with Harris and assisted with Moore.
¶ 20. Investigator Loller testified that his findings showed that while Rayfield and others were securing Bogen, Harris took Hines, already handcuffed, into the ice room and beat him.
¶ 21. Though Rayfield was not questioned specifically at the hearing regarding an injury to Moore, Loller testified that Rayfield witnessed Harris drive Moore's head into the brick wall where the three inmates were placed. Such an action was consistent with one of Moore's injuries, a large contusion to the forehead. Harris denied that he would have bashed Moore's head in the presence of so many officers.
¶ 22. Harris then ordered that the inmates be taken to the clinic. David Fondren, the hearing officer who had been involved at the Department, testified at the Appeals Board hearing:
According to the testimony, [the three inmates] were not as near as beaten up *1195 as badly when they left C-Building en route to the clinic. They left point A en route to point B. When they left point A, they were in pretty good shape. When they got to point B, they were beat half to death.
¶ 23. Harris initially denied being part of the "escort team" that accompanied the inmates to the clinic. However, numerous witnesses, including Lieutenants Jackson and Rayfield, testified that Harris was a part of the group, trailing the inmates by twenty or thirty feet as they left the building in which the uprising had occurred. Harris explained his confusion at what was meant by "escort," admitting that he did follow the inmates en route.
¶ 24. Edia Coleman, a case manager at the facility, witnessed the group enter the administration building by the law library door. She saw Harris escorting Hines in the hallway between "max door" and the watch commander's office. Though Coleman could not see to the end of the hallway, she testified that she heard "loud screaming noises."
¶ 25. Harris denied that the group entered at the law library door. He testified instead that he entered through the maximum security door and that he was never in the area described by Coleman. Harris's own witness, Gloria Wilson, could not corroborate his testimony, stating that Harris entered via the door "next to the watch commander's office." As Lieutenant Rayfield explained, there were three doors into the administration building: the law library door, the watch commander's door, and the maximum security door. Wilson's testimony fit neither Coleman's nor Harris's. Rayfield also testified that he saw the group enter via the law library door.
¶ 26. When the inmates were finally examined upon reaching the clinic, Hines was diagnosed with a broken jaw and possible broken ribs. Bogen had fresh swelling in the lymph nodes of his groin and back pain, and Moore had a large contusion on his forehead. All three also suffered from numerous fresh bruises and abrasions. Hines was transported to the University of Mississippi Medical Center for treatment; the other two were sequestered in maximum security isolation cells.
¶ 27. Investigator Loller noted that all three were separated with no opportunity to concoct a conspiracy against Harris. As he questioned each, all three provided nearly identical factual scenarios implicating Harris. Loller also noted that since Harris and Jackson were disciplined, reports of inmate assault had dropped significantly.
¶ 28. During the subsequent investigation into the incident, four officers (including Harris) were directed to appear for a polygraph test. Captain Rufus Burks testified that he orally informed Harris to appear for the polygraph as instructed by the commissioner. Burks further presented a written directive to Harris. He gave Harris the day off prior to the examination to prepare. On the appointed day, Harris did not appear. He clocked in at the correctional facility nearly two hours later than his ordered appearance time. He testified that he unintentionally overslept and that making an explanatory phone call would be "killing time." Harris admitted that the polygraph requirement upset him, but denied that he was uncooperative with the examiner.

3. Appeals Board's basis to reverse
¶ 29. The Appeals Board found that the Department's charges against Harris were not substantiated. Never did the hearing officer nor the Appeals Board acknowledge that it was Harris's burden to prove that the conduct for which he had been terminated did not occur. Richmond, *1196 745 So.2d at 258. We do not discuss the Group II offense, as it is the two Group III offenses that would permit Harris to be terminated. We have summarized the evidence. We now look at why the Appeals Board found that these were unsubstantiated charges.
¶ 30. One of the Group III offenses was that Harris had been involved in unjustified acts of violence. The Appeals Board hearing officer concluded that Harris could not have beaten any inmates because "with that number of individuals around someone should have seen officer Harris assault the inmate." However, the evidence was that the beatings did not take place with large numbers of people standing around. One of the events was said to have occurred in a side room. One person who testified at the Appeals Board level and another whose Department-level testimony was summarized at the hearing both saw Harris in that room with inmate Hines.
¶ 31. Another incident occurred against a brick wall, and a fellow officer testified that Harris had bashed an inmate's head against the wall. The inmate's injuries were consistent with that.
¶ 32. The last incident concerned beatings that occurred after three inmates were escorted away from this public location. That beatings occurred at that time is undisputed, indeed undeniable. There were Corrections Department personnel who testified that Harris went with the team. Four officers were identified as being on the escort team, in addition to whatever role Harris played in the escort. None of those four officers testified. These are the only individuals who would have witnessed the beatings, and thus the failure to have direct evidence from other employees hardly disproves the occurrence as the Appeals Board concluded. Statements from the three inmates who were beaten were also introduced. Their separate and contemporaneous statements, made without the opportunity to consult on a convenient story, all named Harris as one of the perpetrators.
¶ 33. The hearing officer refused to acknowledge the direct evidence of witnesses who saw Harris in the ice room and shoving one inmate's head against the brick wall. There was also testimony of Harris's joining the escort team. The hearing officer removed from the evidentiary equation any circumstantial evidence regarding the events. We find the hearing officer's analysis to be arbitrary and capricious as an improper approach to the evidence necessary to uphold the decision.
¶ 34. The hearing officer also referred to an unwritten Department policy of refusing to uphold claims against officers if they are based solely on charges by inmates. There must be, the hearing officer stated, corroboration by a Department employee or independent evidence. We find nothing in the record to substantiate this view of the legal standard. Regardless, there was substantial corroboration and independent evidence of all of the charges.
¶ 35. The other Group III offense that would justify Harris's termination is that he falsified records. Both Harris and the hearing officer collapsed the two charges of falsification and of physical violence into a winner-take-all proposition: either Harris beat the inmates or he did not. The hearing officer asserted that "the charge of `Falsification of the record,' must be dismissed in that it is based upon Officer Harris denying that he assaulted the inmate." That was error.
¶ 36. There was direct, independent, non-inmate evidence of various actions that Harris took that were materially inconsistent with what Harris reported. There was also substantial circumstantial evidence *1197 that Harris either conducted some of the beatings himself or participated in a group of others who did so. Yet he denied witnessing or participating in any beatings, in even being in the ice room or accompanying the escort team. The hearing officer stated that the falsification of records rose and fell on whether Harris was lying about actually participating in the beatings. That was a legally erroneous understanding of the charge. Regardless of Harris's precise role in the beatings that beyond question did occur, there was substantial evidence that Harris lied about what he did and when he did it. All the particulars in which the statements were false did not have to be known in order for the Department to find that he had falsified in meaningful ways.
¶ 37. In summary, there was substantial evidence from a variety of witnesses. Never did the hearing officer or the Appeals Board itself acknowledge that it was Harris's burden at the Appeals Board level. Neither referred to credibility issues. Instead, artificial evidentiary rules were created and, not having been satisfied, the evidence was found wanting. We find that Harris did not carry his burden of persuasion at the Appeals Board that the charges brought against him were untrue. Instead, we find substantial evidence that the charges were in fact true.
¶ 38. The Department of Corrections could not terminate Harris absent substantial evidence of one or both of the Group III charges. The Department conducted an investigation, provided Harris with notice and an administrative hearing, and concluded that good cause existed for terminating him. There was substantial evidence to support each Group III offense. Termination was a valid disciplinary option based on these charges.
¶ 39. We reverse the circuit court that affirmed the Appeals Board, and in turn reverse the Appeals Board itself and enforce the Department of Corrections's decision to terminate Harris.
¶ 40. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED, AND THE DECISION OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO TERMINATE THE APPELLEE IS REINSTATED. ALL COSTS ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, MYERS, AND CHANDLER, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. BRANTLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.